CERTAIN-TEED PRODUCTS CORPORATION v. COMLY, COUNTY ASSESSOR, ET AL.

(No. 2077; February 14, 1939; 87 Pac. (2d) 21)

80

For the appellants, the cause was submitted upon the brief of *S. Glenn Parker* of Laramie, and *Ray E. Lee,* Attorney General; *Thos. F. Shea,* Deputy Attorney General; and *Wm. C. Snow,* Assistant Attorney General, all of Cheyenne, Wyoming.

For the respondent, the cause was submitted upon the brief of *C. P. Arnold* of Laramie.

*Corthell, McCollough & Corthell* of Laramie, Amici Curiae.

86

BLUME, Justice.

This case involves the question as to whether or not gypsite is, or rather, in 1927 was, subject to a produc-

tion tax under the constitutional and statutory provisions hereinafter mentioned. The court held that it was not, and the county assessor of Albany County and the State Board of Equalization have appealed. Section 3, Article 15, of the state Constitution, provides as follows:

"All mines and mining claims from which gold, silver and other precious metals, soda, saline, coal, mineral oil and other valuable deposit, is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, on the gross product thereof, as may be prescribed by law; provided, that the product of all mines shall be taxed in proportion to the value thereof."

Section 115-601 of the Revised Statutes of 1931, enacted in conformity with the constitutional provision above mentioned, provides as follows:

"The gross product of all mines and mining claims from which gold, silver and other precious metals, soda, saline, coal, petroleum, or other crude or mineral oil, or natural gas, or other valuable deposit is, or may hereafter be produced, while the same are being worked or operated, but not while the same are simply in the course of development, shall be returned by the owner, owners, lessee, or operator thereof for assessment for taxation, assessed for taxation, and taxed in the manner provided for in this article and such tax shall be in addition to any tax which may be assessed upon the surface improvements of such mines or mining claims, and in lieu of taxes upon the land of such claims while the same are being worked or operated."

Gypsite is defined in Webster's New International Dictionary (2nd ed.) as "earthy gypsum." In the New International Encyclopoedia (1915) Vol. 10, p. 528, it is referred to as gypsum dirt and as forming shallow surface deposits in the western United States. These definitions are borne out by the evidence in the case. One of the witnesses, a geologist and mineralogist, stated that it is a fine-grained earthy material consist-

ing essentially of a mechanical mixture of gypsum and certain (probably not a large part of) other materials, including some which may be organic. The witness Moudy stated that he did not consider gypsite as a mineral, seemingly because of the variable quantity of gypsum contained therein. The other witnesses, however, apparently all seemed to be agreed that the substance may be considered as a mineral. The main substance, in any event, is a decomposed gypsum which is derived from gypsum deposits, perhaps on higher ground, by erosion, and which is carried down into lower ground and is deposited there. When carried down, or when deposited, it becomes intermingled with certain other materials, so that the resulting material is, apparently, less valuable than gypsum. See New International Encyclopoedia, supra. The beds in which gypsite is deposited are generally covered up, it seems, with ordinary earthy material, from 6 to 18 inches deep. In some instances, no cover of common earth is found. The deposits of gypsite range in depth from perhaps two to fourteen feet. The witnesses in this case who testified on the subject of gypsite were Mr. Knight, the State Geologist, Mr. Marzel, a former State Geologist, Mr. Moudy, a chemist, Mr. Beckwith, a geologist and mineralogist, and Mr. Brubaker, superintendent of the plant of the plaintiff and respondent herein. They testified in substance that the gypsite involved in this case is valueless except in so far as it becomes a part of the manufactured product, namely, "brown plaster"; that it has no saleable value; that it does not bear the cost of any transportation; that unless used in the manufacture right on the ground, it would be profitless to take it from the ground; that in taking the gypsite from the place where it is deposited, it is only necessary to plow it up, load it into shovels and take it to the plant, where it enters into the manufacture of plaster. The manufactured product sells

for approximately $9.00 per ton. Other facts will be stated hereafter.

The question as to whether or not gypsite is subject to a production tax under the constitution and statute above mentioned has, it seems, been in controversy in this state for a number of years. The testimony shows that the point first came up in 1909, but no production tax was imposed for many years thereafter. It was first subjected to such tax in 1921 or 1922. The tax was paid under protest, and was recovered in an action in court. No further attempt to tax gypsite in that manner was made until 1927, at which time the State Board of Equalization assessed it at the rate of $2.85 per ton. In 1926, the land was taxed as agricultural land. The plaintiff was also taxed as a manufacturer. These taxes were paid. It seems that in 1928 the State Board of Equalization assessed plaintiff's gypsite at 28 cents per ton, but the record does not disclose as to whether or not the taxes in this connection were paid. The instant action was brought to enjoin the collection of the taxes pursuant to the assessment made in 1927, as above mentioned. The action was brought on January 11, 1928, but was not tried until the latter part of 1936. Judgment was rendered in the district court on November 16, 1937, resulting in favor of the plaintiff.

Section 115-122, Rev. St. 1931, provides:

"Any person who purchases, receives, or holds personal property of any description, for the purpose of adding to the value thereof, by any process of manufacturing, refining, purifying, or by combination of different materials, with a view of making gain or profit by so doing, and by selling the same, shall be held to be a manufacturer for purposes of taxation, and he shall list for taxation the average value of such property in his hands, estimated as directed in the preceding section, but the value shall be estimated upon the materials, only, entering into the combination or manufacture."

There is scarcely any doubt in this case that the plaintiff company is a manufacturing company, and has been, and was in 1926 taxed as such. We do not, however, think that that is decisive in this case. The company may manufacture a product and at the same time be engaged in mining all or part of the material which goes into the manufactured product—in other words, it may be a manufacturing, as well as a mining company, and the product used may come from a mine. While some of the witnesses stated outright that the plaintiff did not "mine" its gypsite, Mr. Knight, the State Geologist, was more cautious and stated that the plaintiff was "chiefly" engaged in manufacturing. Mr. Marzell admitted that "obtaining the gypsite for their manufacturing process must be classed as mining." The difference in the testimony is not surprising, for the term "mine" has not been uniformly defined. It is said that "in its primary and restricted sense the word 'mine' as a noun standing alone denotes an underground excavation made for the purpose of getting minerals." Lindley on Mines (3rd ed.) Sec. 88. And so its meaning has at times been confined to the mode in which the mineral or other deposit has been obtained, without regard to its chemical or geological character. The King v. Inhabitants of Segley, 2 Barn. & Ad. 65, 109 Eng. Rep. 1068; King v. Brettle, 3 Barn. & Ad. 422, 110 Eng. Rep. 152; Lindley, supra, Sec. 88. As late as 1934, it was said by the U. S. Board of Tax Appeals (30 B. T. A. 659, 666) that "while a mine is sometimes broadly defined to include any excavation for minerals, it is more strictly used to denote subterranean workings as distinguished from quarries, placers and surface or open works." See also Sovereign Camp W. O. W. v. Arthur, 144 Ark. 114, 222 S. W. 729. This primary meaning, however, was soon enlarged, and under certain circumstances the term "mine" has been held to include quarries and minerals obtained by

open workings. It is said in 40 C. J. 734 that a mine is a pit or excavation from which metallic ores or other mineral substances are taken by digging. And in Northern Pacific R. Co. v. Mjelde, 48 Mont. 287, 137 Pac. 386, we find that it has even been designated as an excavation from which some useful product is extracted. In 18 R. C. L. 1093 it is said that "as originally used, the word 'mine' was exclusively connected with underground workings, but both in this country and in England in later times the word has received an enlarged meaning, and under the modern construction it is not limited to mere subterranean excavations or workings, but includes, for example, beds of clay, ironstone or limestone reached by open workings and working only by open cuts." It appears, accordingly, that the term "mine" is incapable of a definition which would be universally applicable. 40 C. J. 733. And in order to determine the meaning in this case we must consider the probable intention of the framers of the constitution in adopting the constitutional provision above mentioned. 40 C. J. 733.

The Supreme Court of Montana in Northern Pac. R. Co. v. Mjelde, supra, speaking of a constitutional provision (Sec. 3, Art. 12) providing for the taxation of mines and the proceeds thereof, said:

"Starting our investigation with the premise that in formulating section 3 the constitutional convention had under consideration the subject revenue and was concerned with the question of producing sufficient funds to support the government, the elementary rules of construction, as well as the dictates of reason, require that, if there is a doubt as to the sense in which the term 'mine' is used in that section, the doubt should be resolved in favor of a definition under which public revenue will be raised, rather than one which will defeat the obvious purpose of the convention."

This reasoning would seem to be applicable here. And a careful consideration of the constitutional pro-

vision and the debates in the constitutional convention throw considerable light on the subject before us. Previous to the adoption of the constitution, coal mines had been taxed in the same manner as any other property. The provision before the convention, identical with Sec. 3, Art. 15, supra, provided for a production tax. Mr. Hay, a member, objected to it, called attention to the fact that Colorado had no such tax, and pointed to the wonderful development of that State. Mr. Brown, among other things, argued (Journal of Constitutional Convention, p. 638) :

"My friend Hay says the output of mineral in the state of Colorado has been phenomenal. There is no question about it; but what good has the output of that mineral been to the state of Colorado? Not a five cent piece out of the many millions of dollars taken from its mines has gone into the state treasury as a tribute to the state. The mines have been mined out in a large degree, the wealth has been carried from the state and is in the hands of non-residents, the wealth of the state has been taken away, and the riches of the state depleted to this extent, and not one cent of tribute has been paid to the government. Colorado is just so much poorer today than when she adopted her constitution, just so much poorer as the value of the minerals taken from her mines."

Later Mr. Brown offered an amendment to the effect that coal should be taxed at not less than one and one-half cents per ton. Mr. Baxter, arguing in favor of the amendment, said in part (Journal, 686) :

"As for any discrimination against coal in favor of any other interest, it is provided that the legislature shall in future tax mineral, oil, soda, silver *or anything else that is a natural deposit in the ground,* and it should be taxed. * * * I have talked with several gentlemen about these other minerals and they all say that they have not sufficient knowledge to fix any figure upon these other minerals, but we make it the duty of the legislature from time to time to tax the output of all other mines, or oil, *or anything else taken from the*

*ground* for the support of the State in such manner as shall be fair and just, and tax it upon the same system as we have adopted for coal." (Italics are ours.)

We need not give any other extracts from the interesting debate on the constitutional provision under discussion. Those given sufficiently indicate the trend of thought of the members of the convention. They wanted a production tax. They did not want the riches of the state depleted without some benefit to the state. They were at that time mainly interested in coal, but it is clear that they had other minerals in mind. According to Mr. Baxter, oil, soda, silver or *"anything else"* that is a natural deposit in the ground" should pay a production tax. And, since they contemplated a production tax on coal and other valuable deposits, no good reason could be advanced why such deposits should be excluded from the operation of the rule merely because they can be obtained by open workings, and inexpensively, rather than by underground workings and at great expense. The term "mine," then, as used in the constitution and in the statute enacted pursuant thereto must be understood in the enlarged sense above indicated. The evidence in the case at bar shows that the land from which the gypsite is mined was patented as agricultural lands. It is clear, however, that this makes no difference. It merely shows that the existence of the mineral was not known at that time. That fact would not show that it is not land containing valuable minerals or a valuable deposit in fact. Northern Pac. R. Co. v. Mussellshell County, 54 Mont. 96, 169 Pac. 53; Rice Oil Co. v. Toole County, 86 Mont. 427, 284 Pac. 145; Northern Pac. R. Co. v. Mjelde, supra. We think, moreover, that under the evidence in this case, notwithstanding the disagreement of the witness Moudy, the gypsite in controversy may be considered, for the purpose of this case at least, as mineral, or such a substance which, if of the requisite quality, would be,

or might be made, subject to a production tax. The three great divisions of matter are animal, vegetable and mineral. Hendler v. R. Co., 209 Pac. 256, 58 Atl. 486, 103 A. S. R. 1005. It does not appear in the evidence that a great amount of animal or vegetable matter is intermingled with the mineral, so as to take it out of the category of mineral matter for all practical purposes. See State v. Evans, 46 Wash. 219, 89 Pac. 565, 10 L. R. A. N. S. 1163.

On the other hand, not every deposit in the ground comes within the contemplation of the constitution. It must, except as to the products specifically mentioned, be valuable. Appellants say that:

"The decision herein will largely determine whether any tax can be collected hereafter on many materials similar to the gypsite. Undoubtedly any ruling of the court in the instant case will control the right of taxation on such materials as clay used in brick manufacture, clay used in medical preparations, gravel used as ballast, various materials used in the manufacture of cement products and a dozen like materials. Although the record contains nothing regarding any materials except gypsite, yet the similarity of other products of mines cannot be disregarded, and is within common knowledge and subject to judicial notice."

We cannot agree with counsel that the value of the products just mentioned can be judicially noticed by this court. So the scope of this decision is strictly limited by the facts shown herein, and furnishes no precedent for any other product, unless under like facts. If our decision was expected to be as far-reaching as counsel state, evidence as to the value of these other materials have been introduced, for the purpose of comparison. The term "Valuable deposit" as used in the constitutional and statutory provisions under consideration is indefinite. One person might think that if the gypsite is worth five cents per ton at the mine, it should pay a production tax; another might think that

for such purpose it should be worth at least one dollar or two dollars per ton. No definite light has been thrown on the intended meaning by the journal of the constitutional convention. The value of only one product was considered—that of coal, the minimum sale value of which at that time seems to have been one dollar. It was intended, as already stated, that the valuable deposits in the state should pay their just proportion of the taxes; that our riches should not be exhausted without an adequate return therefrom to the state. On the other hand the members of the constitutional convention did not want to hinder the development of our resources. That appears very clearly from the debates, and we may assume that the members of the legislature which passed the statute here under consideration felt the same way about it. Both factors above named must be considered to determine the meaning of "valuable deposit." Manufacturers pay at least some taxes; the taxes paid by plaintiff herein appear to be substantial. We cannot assume, and we doubt, that the members of the constitutional convention or of the legislature meant to assess on deposits in the earth a production tax which, at least in the long run, would prevent manufacturing in the state.

The difficulty in the case before us is to find a legal principle upon which it may be decided—when and under what circumstances it can be said that gypsite should, as a matter of law, be held of such value that it is subject to the production tax contemplated by the constitution and the statute. No definite principle or rule has been suggested to us. The gypsite must, of course, have some value in the broad sense of that term, otherwise it would not be used. But we do not think that that fact alone would warrant us in holding, as a matter of law, that it is subject to such tax. Counsel for plaintiff seem to maintain—and they seem to be supported by the witnesses herein—that the cri-

terion is as to whether or not the material has any sale value at the mine—whether or not it can bear the cost of transportation, and they seem to think that if the material must necessarily be manufactured in a plant located on the ground, in order to yield any profit, then it cannot be held to be subject to such tax. While, doubtless, this fact must be considered, we doubt that it furnishes the ultimate criterion herein. It would seem that the approximate monetary value of the gypsite might have been shown by deducting from the sale value of the manufactured product the cost of manufacture and sale, including overhead expenses, a reasonable profit and perhaps other proper items. The remainder would seem to be the actual value of the gypsite. Suppose that remainder were $3.00 per ton. We think we should then be warranted in saying as a matter of law that the production tax should be assessed. But suppose that the remainder were only five cents a ton. We think we should not be warranted in such case in holding such tax assessable. These illustrations are merely to show the extremes. Without further light on the subject it would, accordingly, seem that, in the absence of further legislation thereon, the criterion in a case like that at bar should be as to whether or not it can reasonably be said, considering all economic factors, that the value of the material is, in the long run (and not for one year merely) such as to be able, reasonably, to bear the production tax in addition to the tax assessed against the manufacturer. It is not necessary herein to determine where that point is, for the reason that there is nothing in the record before us which would enable us to do so. The witness Brubaker testified that "gypsite has no intrinsic value"; that "it has no monetary value." The witness Moudy testified that "I wouldn't say it (gypsite) had any particular value in itself." The witness Knight stated that "in the raw state it (gypsite) is worthless."

The witness Beckwith stated that "I should say that the gypsite which has not been subjected to any manufacturing process has no money value." There is nothing in the record to contradict this. While better evidence might have been produced, it was not done. Hence it is impossible for us to say that the trial court's judgment is wrong.

We are cited to the case of Nephi Plaster etc. Co. v. Juab County, 33 Utah 114, 93 Pac. 53, 14 L. R. A. N. S. 1043. The court held in that case that the profit realized from the product manufactured from gypsum constitutes net proceeds under the clause of the constitutional provision that all net proceeds of "all mines and mining claims shall be taxed." Perhaps the case furnishes some slight analogy in the case at bar, although we cannot overlook the fact that a production tax on the gross product, and a tax on the net proceeds, are dissimilar. The term "valuable" needs no interpretation in the latter case. In any event the facts in this case are different from the facts in the Nephi case. It was admitted in that case that gypsum is a mineral and constitutes a valuable mineral deposit—the very fact in dispute in this case. No attempt was made in the trial of this case to compare the value of gypsum and gypsite, and we cannot take judicial notice thereof. Gypsite, the ingredient of which is mainly decomposed gypsum, would, on its face, seem to be of less value than gypsum. It may, however, be that the ease with which gypsite is mined as compared with the cost of mining gypsum, makes up the difference in value. But we do not know and we cannot speculate on that point in arriving at a decision herein.

It is readily seen, upon due reflection, that in a case like that at bar, and in connection with other deposits in the earth, we are confronted with the factor of balancing the public interests—obtaining proper revenues on the one hand and encouraging manufacturing on

the other. That function should be performed, primarily at least, by the legislature, which, we doubt not, as the ultimate fountain head of the power of taxation, has full power to resolve doubts arising in a case like that before us and in similar cases, and it is somewhat surprising, in view of the long dispute above mentioned, that the State Board of Equalization has not hitherto deemed it advisable or necessary to obtain its advice and consent, but has deemed fit to rest this case upon evidence which makes it impossible for us to sanction the assessment made herein. Moreover, that assessment should not be permitted to stand for another reason. The State Board of Equalization, so the record shows, assessed the plaintiff with 20,000 tons, whereas only 14,000 tons were mined. The books of plaintiff were open to it. It apparently sought no information, either as to the tonnage or the value. Coal was assessed, during 1927, at a maximum of $2.50 per ton. The gypsite mined by plaintiff was assessed at $2.85 per ton. The next year, it seems, it was assessed at 28 cents per ton. In view of the evidence herein as to the value of the gypsite, the assessment cannot be said to have been made in good faith. It cannot be considered a mere overvaluation within the meaning of Bunten v. Rock Springs Grazing Association, 29 Wyo. 461, 215 Pac. 244. It must be considered as arbitrary and as a constructive fraud. The judgment of the trial court must, accordingly, be affirmed.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.