**Francis HILLARD et al., Appellants (Appellees below),**

v.

**BIG HORN COAL COMPANY, a Wyoming Corporation, and Rosebud Coal Sales Company, a Wyoming Corporation, Appellees (Appellants below).**

**BIG HORN COAL COMPANY, a Wyoming Corporation, and Rosebud Coal Sales Company, a Wyoming Corporation, Appellants (Appellants below),**

v.

**Francis HILLARD et al., Appellees (Appellees below).**

**Nos. 4405 and 4406.**

Supreme Court of Wyoming.

May 7, 1976.

David B. Kennedy, Atty. Gen., James D. Douglass, Sp. Asst. Atty. Gen., Cheyenne, for appellants in Case No. 4405, and for appellees in Case No. 4406.

E. E. Lonabaugh, Lonabaugh & Bonner, Sheridan, for appellees in Case No. 4405, and for appellants in Case No. 4406.

Before GUTHRIE, C. J., and McCLINTOCK and THOMAS, JJ.

THOMAS, Justice.

These cases are here pursuant to the provisions of the Wyoming Administrative Procedure Act and the Wyoming Rules of Civil Procedure relating to appeals from administrative decisions.[1] The substantive setting is familiar to this Court. *C F & I Steel Corp. v. State Board of Equalization*, Wyo., 492 P.2d 529 (1972), and *J. Ray McDermott & Co. v. Hudson*, Wyo., 370 P.2d 364 (1962). It encompasses the constitutional and statutory provisions relating to the State Board of Equalization (hereafter referred to as the Board) and its prescribed role in the tax structure of the State of Wyoming. These cases involve taxation of coal production and center upon the activities of the Board (required to be legislatively created by Art. 15, § 9, Wyo.Const., and the duties of which are prescribed by Art. 15, § 10, Wyo. Const.) in effectuating the mandate found in Art. 15, § 3, Wyo.Const., that, "All mines * * * from which * * * coal * * * is or may be produced shall be taxed in addition to the surface improvements, * * * on the gross product thereof, as may be prescribed by law; provided, that the product of all mines shall be taxed in proportion to the value thereof." This result is to be achieved with due regard to the constitutional requirements that all property is to be uniformly assessed for taxation (Art. 15, § 11, Wyo.Const.), and all taxation will be equal and uniform (Art. 1, § 28, Wyo.Const.). The legislature has provided a statutory framework pursuant to which the production from coal mines is to be returned and assessed. Section 39–222, W.S. The owner must file a sworn assessment schedule statement setting forth the gross production, and this statement must also include such information as the Board has requested to determine value. Sections 39–223 and 39–227.3, W.S. The Board must then compute the value of the gross production and fix the valuation. Sections 39–224 and 39–227.4, W.S. See generally, *C F & I Steel Corp. v. State Board of Equalization*, supra, and *J. Ray McDermott & Co. v. Hudson*, supra. The Board has general statutory authority to prescribe a system or systems for establishing the uniform valuation of all properties. Section 39–26(*l*), W.S.; and *J. Ray McDermott & Co. v. Hudson*, supra. In performing its constitutional and statutory functions the Board may arrive at different valuations for different property, but the method or system used by the Board must lead to a fair value, and the properties must be assessed at a uniform rate. *Scott Realty Co. v. State Board of Equalization*, Wyo., 395 P.2d 289 (1964). The Board does have authority to equalize the values where that is appropriate in order to meet the constitutional requirements. The burden is on the taxpayer to establish any overevaluation. *Weaver v. State Board of Equalization*, Wyo., 511 P.2d 97 (1973), and *Scott Realty Co. v. State Board of Equalization*, supra.

Big Horn Coal Company and Rosebud Coal Sales Company (hereafter referred to as the coal companies) initiated this case by filing protests before the Board contesting the 1971 and 1972 assessed values for the coal produced by the companies in 1970 and 1971. The grounds stated in the several protests were substantially the same, and as to each of the coal companies

---

1. Sections 9–276.32 and 9–276.33, W.S.; and Rules 72.1 through 76, W.R.C.P.

they were identical for the same year.[2] All four of these protests were consolidated for hearing before the Board and the coal companies filed a joint petition for review from the respective orders entered by the Board which found the facts and construed the law contrary to the contentions of the coal companies and denied each of the protests.

In their Petition for Review the coal companies added some specificity to the grounds asserted in their objections and protests, but essentially the same grounds were asserted.[3] The District Court of the

2. As to both companies the grounds specified in the objections for the tax year 1971 based upon production in 1970, were as follows:

"(a) Said assessment is not in accordance with the announced policies of the Board in 1968, later meetings of the industry and the Board and previous assessments.

"(b) Said assessment is not uniform with other assessments in the coal industry for the State of Wyoming.

"(c) The formula used, or proposed to be used, by the Board contains arbitrary and fictitious items and does not result in a fair and accurate assessment of the property proposed to be taxed.

"(d) That said proposed assessment imposes an undue burden upon interstate commerce and that said assessment, as proposed, leads to an unconstitutional deprivation of property without due process of law.

"(e) That said proposed assessment is arbitrary, capricious, discriminatory, unfair as to different coal producers in the State of Wyoming and a grave abuse of discretion."

In the protests filed for the tax year 1972 based upon production for 1971 the grounds read as follows:

"(a) That said assessment or valuation is not in accordance with the announced policies of the Board in 1968, later meetings of the industry and the Board in previous assessments or valuations.

"(b) That said assessment or valuation is not equal and uniform with other assessments or valuations in the coal and other hard-mineral industries for the State of Wyoming.

"(c) That the formula used, or proposed to be used, by the Board contains arbitrary and fictitious items and does not result in a fair and accurate assessment or valuation of the property proposed to be taxed.

"(d) That said proposed assessment or valuation imposes an undue burden upon interstate commerce and that said assessment or valuation, as proposed, leads to an unconstitutional deprivation of property without due process of law.

"(e) That said proposed assessment or valuation is not in compliance with other Constitutional and Statutory Law of the State of Wyoming.

"(f) That said proposed assessment or valuation is arbitrary, capricious, discriminatory, unfair as to different coal and hard-mineral producers in the State of Wyoming, and a grave abuse of discretion."

3. In the Petition for Review the grounds asserted by the coal companies read as follows:

"VIII.

"That the decisions of the Board as contained in its Orders of the 28th and 30th of March, 1973, Exhibits 'A', 'B', 'C' and 'D' attached hereto, should be reversed as being in violation of the laws of the State of Wyoming, the law on the subject of assessment of coal and hard mineral production, the Constitution of the State of Wyoming, the Constitution of the United States of America, and that the Board's Orders constitute an undue and unreasonable burden on Interstate Commerce, result in unequal, non-uniform and discriminatory taxation, result in taking of Appellants' property without due process of law and deny Appellants the equal protection of the laws.

"IX.

"That the Board did not, and has not, followed its announced 'formula' in reaching its decisions on the assessments herein mentioned; that, if said 'formula' is legal and constitutional, which is not admitted but denied, then the said Board should be required to follow said 'formula.'

"X.

"That, in attempting to apply the said 'formula' in these matters, the Board has used fictitious and arbitrary items; that, further, the Board has used different applications of said 'formula' for various segments of the coal and hard mineral industry; that the Board's use of said 'formula' in these matters has resulted in unfair and inaccurate assessments of the production taxed.

"XI.

"That in making the assessments protested and reaffirming the same by its said Orders the Board has (a) acted without, or in excess of, its powers, (b) acted without conformity with the laws of the State of Wyoming, the general law of assessment of produced minerals, the Constitution of the State of Wyoming and the Constitution of the United States of America,

First Judicial District in and for Laramie County affirmed the orders of the Board except for two particular items. The district court held that the Board should not have included any royalty in its valuation that was not actually paid by the coal companies, and it further held that the cost of loading coal in a strip mine should be considered an expense of transportation and processing rather than a mining expense. The coal companies appeal from so much of the judgment of the district court as affirms the orders of the Board and the Board has taken its appeal from the rulings of the district court with respect' to the questions of the correct royalty and the proper application of the loading costs.

On March 26, 1970, the Board adopted a method for the valuation of minerals other than oil, gas, and uranium by a minute entry in the records of the Board. This Board action is the focus of the issues in this appeal, and it, therefore, is set forth in full:

"*Minute Entry.* March 26, 1970.

"The Board unanimously agreed that the value of minerals other than oil, gas and uranium should be determined by the following formula:

"Sales price of processed product f. o. b. contract or commercial carrier, minus all costs to point of determined sales price equals money profit. All costs to point of determined sales price less royalty divided into money profit equals percent of profit. Mining cost less royalty multiplied by percent of profit equals mine profit. Cost of mining plus royalty plus mine profit equals value of mineral as mined. If a sales price can only be obtained at a point after commercial transportation the price used will be that price less the commercial transportation charge.

"Uranium shall be valued by the Circular 5 price on the average yearly grade of each mine, reduced or increased by the percentage of the average yearly sale price of $U_3O_8$ per lb. The producer's transportation cost shall be deducted on the basis of commercial transportation paid or actual cost plus a reasonable profit.

"Oil, as in the past, will be valued at the contract or posted field price less transportation, if any, to the nearest pipeline tariff point."

In their appeal the coal companies first argue that the minute entry represents a cost formula which in its application violates the provisions of Art. 1, § 28 and Art. 15, § 11, Wyo.Const. In making this contention they present two themes: First, the application of this formula results in a lack of uniformity in coal values; and secondly, the method of assessment represented by the formula does not reflect value. A second major contention of the coal companies is that if this minute entry formula is valid as a method of assessment for coal, the Board must be required to follow it as stated. The coal companies' third point in their appeal is that royalty paid with respect to coal mined should be prorated between mining costs and processing costs in applying the formula. The coal companies' fourth argument is that production and severance taxes and real estate taxes paid for a prior year should not be considered as mining costs and added to the value of the coal for a current year. The final contention of the coal companies is that in working with the formula the Board must consider and apply in the valuation process all of the information supplied by the coal companies. Some discussion of the factual background is essential to place the legal contentions of the coal companies in perspective.

The action of the Board in adopting the method of mineral valuation reflected in the minute entry of March 26, 1970, was

(c) made findings of fact and conclusions which are unsupportable by substantial or competent and reliable evidence, and/or (d) made decisions which are arbitrary, capricious and/or characterized by abuse of discretion."

the product of a process begun in 1967 and 1968. The method was discussed in meetings, held during those years, with the mineral producers and with various accounting firms with respect to the allocation of costs for purposes of cost accounting. This investigation and study did encompass contact and dialogue with persons and firms actually involved in the mining of coal and other minerals within the State of Wyoming. The process did involve a rather lengthy consideration by the Board and its staff which was designed to reach the most appropriate method for arriving at mineral valuations. To support their contentions in this appeal the coal companies, apparently with the cooperation and consent of the Board, introduced a considerable amount of evidence relating to the valuation of other minerals. The law of the State of Wyoming, however, justifies reasonable classification for purposes of taxation (*State v. Willingham*, 9 Wyo. 290, 62 P. 797 (1900)), and we therefore limit our treatment of the issues presented in this case to the application of the valuation method to the mining of coal which, as the trial court found, is a reasonable classification for these purposes.

In accordance with its statutory duties the Board prepared, published and disseminated to all coal producers a form entitled, "ATD Form 8F, Confidential Supplemental Report." [4] This form was designed to develop information from coal mining firms with respect to coal produced, coal sales, processing costs, mining costs, reclamation expense, transportation costs from mine to tipple, and royalties. Wherever appropriate this form requested the information in both quantities and dollar amounts. The Board assumed that, with the data presented to it by completion of the form, it could in any given instance identify, as components of the sales price reported, the amounts of profit, royalty, mining costs, processing costs, and transportation expenses. After deducting transportation expenses and royalty, profit was to be allocated between mining operations and processing operations by applying the profit percentage of the total operation to each of those cost categories. The value of the coal at the mine mouth then was to be determined by adding to the mining costs, the royalty, and the profit attributed to the mining phase of the operation.

As events transpired the assumption by the Board was a vain hope. In 1970 there were fourteen producing coal mines in the State of Wyoming, and five of these mines produced 6,648,170 tons out of a total production for that year of 7,039,980 tons. The remaining nine mines accounted for the production of only 391,810 tons. In the valuation of this production in 1971, with respect to the coal produced in 1970, the Board found that it could apply the formula to only three of the top five coal producing companies. The three included the appellants and one other coal company. With respect to the other two of the top five companies one of them consumed its production in a steam generating plant, and therefore reported no sales values which resulted in insufficient information upon which to apply the formula; as to the other, it contracted the mining of its coal and the valuation was determined by adding a fifteen cent royalty and a thirteen cent per ton payment of fringe benefits to the United Mine Workers Welfare Fund to the price paid to the contract miner for mining the coal. The Board found that the effect of this method was to treat that company similarly to

---

4. Section 39–227.3, W.S., provides:
"Every person, partnership, corporation, company, firm or association of whatever nature, extracting any of the products herein above described shall be required to report the gross production for the preceding calendar year together with such information as shall be requested to determine the value thereof, to the State Board of Equalization not later than the second Monday in February in each and every year, and shall be liable for the payment of the tax assessed thereof."
Pursuant to this statutory provision the Board is authorized to obtain the information necessary to perform its functions in accordance with §§ 39–223 and 39–224, W.S.

the other companies to which the formula was applied. With respect to the company in the top five which had no sales, its coal was valued identically with the most similar company in the five to which the formula was applied. The formula was not applied to the other nine coal mines, but using as a base either these two coal companies or the contract mining coal company, valuations were based upon a comparison of the BTUs in the coal mines, with six of those companies being compared to the contract producer and the other three being compared to one or the other of these two coal companies. The Board determined which of the base companies the coal from the other nine mines should be compared with on a BTU basis by looking to the geographical locations of the mines. The comparison valuation was necessary because in some of these instances insufficient information was reported to permit the application of the formula, while in others the application of the formula obviously was not appropriate because of discrepancies in the information reported, such as instances in which costs exceeded total selling prices.

Much the same situation prevailed in 1972 when the 1971 coal production was valued by the Board. In 1971 two mines which had produced coal in 1970 had discontinued their production, but there was production from one new mine, leaving thirteen producing mines in 1971. In this year the five major producers accounted for 6,865,143 tons out of a total of 7,743,347 tons, leaving 878,204 tons mined from the other eight producing mines. The values for the five major producing companies were established in the same way as in 1971. Of the remaining eight mines the values were assigned on a BTU comparison basis with five of them being related to the contract mining company and the other three compared with one or the other of these two coal companies.

In presenting the questions raised by their appeal the coal companies repeatedly discuss the method of valuation reflected by the minute entry as being a cost method of valuation which they then attack as being incorrect and leading to improper results. This characterization of the formula prescribed in the minute entry is too limited in scope. The real effect of the minute entry, as applied, is to arrive at the value of the mineral at the mine by separating, as components of the total sales price, the value attributable to processing or transportation and the value of the mineral at the mine. Prior decisions of this court have recognized the necessity for such a process. *C F & I Steel Corp. v. State Board of Equalization,* supra, and *Certain-Teed Products Corp. v. Comly,* 54 Wyo. 79, 87 P.2d 21 (1939).

■ With respect to the fundamental contentions of the coal companies that the formula or method represented by the minute entry of March 26, 1970, is unconstitutional because it leads to a lack of uniformity and does not reflect value, and if constitutional it must be followed literally in all instances by the Board, we affirm the district court in upholding the determinations of the Board. The task of the Board was that of arriving at a value of the coal at the mine when the circumstances did not permit a determination of that value according to the usual standard. This Court has adopted as the standard for the true value of personal property for taxation the price that the property could be sold for in the usual course of business. *J. Ray McDermott & Co. v. Hudson,* Wyo., supra, at p. 368, and *Bunten v. Rock Springs Grazing Ass'n,* 29 Wyo. 461, 215 P. 244 (1923). When, as here, no sale occurs at the point in the mining and production process at which the tax assessment must be made then, as the Court said in *J. Ray McDermott & Co. v. Hudson,* supra, at p. 368, " * * * [T]he rule is well settled that the value of personal property for purposes of taxation should be *estimated* according to the fair actual cash market value. * * *" (emphasis supplied) In so doing the tax authorities are instructed that they should take into consideration all

factors which relate to value. *State ex rel. Greenwood v. Pearson,* 46 Wyo. 307, 26 P.2d 641 (1933). Among the factors so to be considered is a usual and reasonable profit to the mine operator. *C F & I Steel Corp. v. State Board of Equalization,* supra.

As was true in *C F & I Steel Corp. v. State Board of Equalization,* supra, the question raised here is whether the method used by the Board to determine the values under these circumstances was proper. A fair description of the method and goal of the Board in this instance is that it was attempting to allocate the actual sales price received by the coal companies, which according to the usual test is a basic measure of value, between the value of the product as it came from the mine and the value which was added by such operations as cleaning, screening, or other processes occuring between the extraction of the coal from the mine and its ultimate sale, thus arriving at the true estimate of the fair actual cash market value of the coal at the mine. The method as applied by the Board was to determine from the total expenses of the coal companies' operations which of those were directly paid for mining the coal and which of those were directly paid for processing operations subsequent to the mining. In each instance there were left over certain costs and expenses which were not directly attributable to either mining or processing and the profits earned by the companies. These indirect expenses and the profit were attributed to either mining or processing according to the ratio of the direct mining costs and the processing costs as compared to the total of those costs. If, for example, the mining costs were 51 per cent of the total costs directly attributable to mining and processing, then 51 per cent of the indirect costs and profit would be allocated to the mining of the coal and 49 per cent of the indirect costs and profit would be allocated to the processing. The value of the coal at the mouth of the mine then was found to be the total of the direct mining costs plus the

royalty plus the allocation of indirect costs and profit. Stated in the abstract, this method does not appear to be arbitrary, capricious or an abuse of discretion.

The coal companies, however, attack its application to them relying upon Art. 1, § 28, Wyo.Const., together with Art. 15, §§ 3 and 11. Citing some of the language in *Bunten v. Rock Springs Grazing Ass'n,* supra, the coal companies assert that their property was assessed at full value, but there exists discrimination as to them because all of the taxable property of the rest of the class was not assessed uniformly and the departure from uniformity occurred because of the adoption of a wrong or illegal rule, principle or method. It does not appear that the coal companies seek to support their position by contending that the Board was guilty of fraud in intentionally and systematically discriminating against them. Their position instead is that the method found in the Board's minute entry reaches an erroneous and disparate result which they seek to demonstrate by calling attention to the discrepancies in values ranging in 1971 from $.83 to $2.57 per ton and in 1972 from $.95 to $2.84 per ton. They contend that these discrepancies could not occur if the values were uniformly determined. In part, they attribute these results to the fact that the formula was not applied in all instances. In addition, the coal companies assert that if the formula were uniformly followed this would not result in correct values, because a company with higher mining costs would have its coal assessed at a higher value than a company with lower mining costs even though the other circumstances were comparable to the point of being identical, including the actual selling price of the coal.

While the record demonstrates, and the briefs reaffirm, a notion held by the Board that this valuation method had its genesis in the case of *Certain-Teed Products Corp. v. Comly,* supra, it is demonstrable from the record that the Board really was applying the concepts announced in *C F & I Steel Corp. v. State Board of Equalization,* supra.

In this latter case such a process was dictated by the fact that there was no selling price of the iron ore. In *Certain-Teed Products Corp. v. Comly,* supra, Justice Blume speaking for the Court by way of illustration said at 87 P.2d 26:

"It would seem that the approximate monetary value of the gypsite might have been shown by deducting from the sale value of the manufactured product the cost of manufacture and sale, including overhead expenses, a reasonable profit and perhaps other proper items. The remainder would seem to be the actual value of the gypsite."

It is obvious that the situation there confronting the Court was distinguishable from many mineral production activities because of the manufacturing process involved. In *C F & I Steel Corp. v. State Board of Equalization,* supra, this Court approved a method of valuation which entailed establishing a selling price and deducting from that the cost of transportation from the mine site to the point of sale. From this result there were deducted the company's mining costs and its beneficiating costs resulting in an established profit. The profit then was divided between the mining and the beneficiating on a two-thirds/one-third ratio which was the ratio between these two costs. The division of the profit was the issue posed in the appeal, and this Court held that a part of the profit must must be attributed to the mining operations. The application of the formula by the Board in this instance therefore was proper and legally justified by the previous considerations of similar methods by this Court.

The coal companies contend, however, that the formula was not followed by the Board. They rely upon testimony of one of their company officials in which he demonstrated how he arrived at a different value by a so-called literal application of the formula. The essential difference between his approach and that of the Board was that his first step was to deduct from the sales price all costs, that is, mining costs, processing costs, and indirect costs, in arriv-

ing at a money profit. He then deducted the royalty paid from all of these costs and divided that result into the money profit to determine his per cent of profit. He then applied that per cent of profit to mining costs only and added his product to the mining costs plus the royalty. His method eliminated any allocation of the indirect costs to the mining operations. The Board, on the other hand, attributed a pro rata share of the indirect costs to mining operations. The Board did not adopt any rules or regulations setting forth interpretations of its minute entry or furnishing instructions with respect to its application. Under these circumstances the construction manifested by the application of the minute entry by the Board is reasonable and certainly not unlawful. The fact that the coal companies' witnesses disagreed with the manner in which the formula was interpreted or disagreed with the result which was reached, is not sufficient to meet the companies' burden of demonstrating that the Board acted fraudulently, arbitrarily, capriciously, or in abuse of its discretion. It simply demonstrates that there was a difference of opinion from that held by the members of the Board. *State ex rel. Greenwood v. Pearson,* supra.

Complaint also is made by the coal companies of the fact that the formula as it is described and interpreted by the Board was applied only to these two companies and one other. The comparative valuation of the product of other mines is then relied upon as showing a lack of uniformity resulting in illegality of the assessment. The Board pragmatically and plausibly meets the arguments arising out of the discrepancy in valuations by pointing out that there were similar and proportionate discrepancies in the sales prices of the coals involved. The record demonstrates further that the comparative valuations were made using as a base the valuations reached pursuant to the formula or through an approach which the Board found to be equivalent to the formula. This results in uniformity of assessment, not the lack of uniformity about which the coal companies complain. Granted it does

not result in a uniform value for all of the coal mined in the State of Wyoming, but the record demonstrates that the coal mined from different places in the State of Wyoming in fact does have different values. If the valuation of the other coals had not been made in comparison with coals to which the formula have been applied, it then would seem that the Board's position would be a departure from its constitutional and statutory duties. Since the converse is demonstrated by the record, however, the decision of the district court upholding the conclusion of the Board that the valuations properly were arrived at and the correct assessments made, which has the benefit of a presumption of lawfulness, is not shown by the record to be erroneous.

In relying upon a disparity in valuations the coal companies overlook another concept found in *Bunten v. Rock Springs Grazing Ass'n,* supra. The court pointed out that not every discrimination should render an assessment or tax invalid either in whole or in part, and noted that it frequently had been held that omission to assess property either from mistake of law or fact, or accidentally, did not protect other taxpayers from the tax assessed against them.

With respect to Big Horn Coal Company, a royalty of 15 cents per ton was included in the formula as applied by the Board in determining the value of the coal at the mine. The actual royalty paid by Big Horn was 10 cents per ton. The district court did find that in this aspect of the application of the formula the action of the Board was contrary to law. The Board appeals from this holding of the district court and here seeks to justify its position by asserting that the necessity of uniform assessment provided for in the law compels the standardization of the royalties with respect to coal mined in the State of Wyoming.

We affirm the decision of the district court with respect to its holding as to the artificial royalty. The record in this case demonstrates, and the position of the Board before this Court is, that coal which is mined from various mines within the State

of Wyoming does not have a uniform value. The application of the formula is relied upon to demonstrate true value based upon the actual sales prices and expenses or costs of the respective mining companies. As a component of the value of coal as it comes from the mine, royalty must be included at its actual, not an artificial amount. Certainly the value of the coal at the mouth of the mine must equal the costs of mining plus royalty or there could exist no incentive to produce it. While such a situation might be extreme, considering the situation in this light, a landowner might well agree to a lower royalty as an inducement for the mining of coal on his land because otherwise the costs of mining would permit no profit to the mining company and would foreclose any production of the coal leaving the landowner with no royalty. If a lesser royalty or no royalty at all is paid, this simply results in the margin of profit in such an instance being larger than in a comparable instance when a royalty is paid.

■ In their appeal the coal companies argue that a proper application of the formula would require that the royalty be prorated between the processing and mining aspects of their production operations like any other indirect costs. While the mineral involved was oil rather than coal, in *Picard v. Richards,* Wyo., 366 P.2d 119 (1961), this Court adopted a definition of royalty, which generally is applicable, to the effect that it means a share of the product reserved by the owner of land for permitting another to use his property, and is a right to receive in kind or in money equivalent a stipulated fraction of the mineral products. It thus is apparent that royalty must be paid for the privilege of mining, not processing, and as has been indicated above, the value of the coal at the mine must be sufficient to pay both the costs of mining and royalty. We affirm the ruling of the district court upholding the decison of the Board that royalty is a full component of the value of the coal at the mine, and is not to be apportioned between mining and processing as indirect costs may

be. See *Northern Pac. Ry. Co. v. Mussel-shell County*, 74 Mont. 81, 238 P. 872 (1925).

The coal companies argue in their brief that it is improper under the law for any portion of the production and severance taxes from the prior year to be attributed to mining costs. They insist this results in the imposition of tax upon a tax. These expenses, however, are part of the overall costs or expenses of the company. They are a part of the cost that necessarily must be covered by the value of the coal at the mouth of the mine, or otherwise the mining incentive might be lost. The value of the product at the mine must be enough to cover those expenses which must be paid to mine it and also the taxes imposed upon the product in addition to the royalty. It well may be that the Board was overly generous in allocating these taxes as a part of the indirect costs. This, however, is not an issue before us, and with respect to the issue posed we sustain the decision of the district court which held that the Board properly included these expenses in making its allocation of indirect costs to arrive at the estimated true value of the coal at the mouth of the mine.

We do reverse the decision of the district court and reinstate the treatment by the Board of the loading expenses at the mine. There are several factors which lend support to our conclusion in this regard. First, we must consider the very nature of a strip mining operation in which after the first ore is mined the overburden from the successive mining strips usually is placed into the excavation left by the immediately preceding operation. The stripping process is an essential part of mining in such an operation, and in this instance the stripping expense was attributed to mining costs. Viewing the operation in this way, logic compels a conclusion that the mining is not completed until the coal has been loaded for removal from the pit because that must be done in order for the stripping, which is part of the mining, to go forward. The coal companies' reliance on *Oregon Basin Oil & Gas*

*Co. v. Ohio Oil Co.*, 70 Wyo. 263, 248 P.2d 198 (1952), is not persuasive because it deals with the effect of severance without really telling when it occurs even in the case of oil. We find that in analogous situations other courts have concluded that mining is not completed until the ore has been loaded for transportation. *Food Machinery and Chemical Corp. v. United States*, 348 F.2d 921, 172 Ct.Cl. 313 (1965); *Winnsboro Granite Corporation v. Commissioner of Internal Revenue*, 283 F.2d 307 (4th Cir. 1960); *Gray Knox Marble Company v. United States*, 257 F. Supp. 632 (E.D.Tenn.1966); *State v. Birmingham Rail & Locomotive Co.*, 259 Ala. 443, 66 So.2d 884 (1953); *Pittsburgh Pacific Co. v. Commissioner of Taxation*, 290 Minn. 418, 188 N.W.2d 875 (1971); *West Lake Quarry & Material Co. v. Schaffner*, Mo., 451 S.W.2d 140 (1970); *Dye Coal Co. v. Evatt*, 144 Ohio St. 233, 58 N.E.2d 653 (1944). The loading of the coal in a strip mine is very like raising the coal to the surface of an underground mine which in the latter instance is a part of the mining. Finally, in § 2, Chapter 125, S.L. of Wyoming, 1975, there appears legislative approval of the interpretation by the Board in these earlier years. Section 39-224(b), W.S. While that statute is not applicable to the tax years involved in these cases, there is little purpose to be served in a judicial creation of a different rule for these years from the one which was applied by the Board and to which the legislature has evidenced its assent.

■ We do affirm the decision of the district court with respect to the coal companies' argument that there was error in the failure of the Board to consider certain additional information with respect to costs in making the 1971 assessment for the 1970 coal production. Recognizing that the Board in such an instance is to consider all factors related to value (*State ex rel. Greenwood v. Pearson*, supra; and see *Lake De Smet Reservoir Co. v. Kaufmann*, 75 Wyo. 87, 292 P.2d 482 (1956)), we conclude that this requirement must be

limited in terms of time. The information with respect to the products tax on minerals is to be certified to the Department of Revenue so that it can notify the taxpayers of the amount of severance tax by the first weekday in June. Section 39–227.4, W.S. Furthermore, this information is used by the respective counties and they must establish their budget by the fourth Monday in July of each year. For the 1971 assessment this process was accomplished on the basis of the information furnished in 1971, and we hold that the Board was not required to amend or adjust the assessments already relied upon because of information which was not furnished by these coal companies until the latter part of March in 1972.

The decision of the district court is affirmed in part and reversed in part and remanded for the entry of judgment in accordance with the views herein expressed.

RAPER, J., took no part in the consideration or decision of the case.

ROSE, J., not a member of the Court at the time of oral argument.