**AMAX COAL COMPANY, Petitioner,**

v.

**WYOMING STATE BOARD OF EQUALIZATION,**
**Respondent.**

**No. 90–265.**

Supreme Court of Wyoming.

Nov. 18, 1991.

Lawrence J. Wolfe and Matthew H. Thomas of Holland & Hart, Cheyenne, for petitioner.

Joseph B. Meyer, Atty. Gen. and Michael L. Hubbard, Sr. Asst. Atty. Gen., Cheyenne, for respondent.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

In this appeal we address petitioner Amax Coal Company's protestations that respondent Wyoming State Board of Equalization (Board) erred in assessing its Belle Ayr and Eagle Butte coal mines for tax year 1988. The thrust of Amax's protest is that the Department of Revenue and Taxation, Minerals Division (Division), used an improper assessment formula which overvalued their coal production and operated in a discriminatory manner prohibited by Wyoming's Constitution, which valuation was then confirmed by the Board after a hearing. Further, Amax contends the Board incorrectly treated an intercompany royalty, which Amax pays to its wholly owned subsidiary, Meadowlark, Inc., as a private royalty and improperly included Black Lung Excise Tax in the assessment process.

We will affirm the Board's decision and order in all respects.

## ISSUES

Amax proposes these issues for our disposition:

I. Whether the Board's inclusion of taxes and fees as mining costs in the cost approach erroneously attributes profit to taxes, is discriminatory, fails to result in uniform and equal taxation and is unsupported by substantial evidence.

II. Whether the Board's decision approving the use of direct costs instead of total costs in the cost ratio is contrary to the department's rules and produces erroneous taxable values.

III. Whether the Board's decision approving the tax treatment of Amax's intercompany royalty, that results from Amax's dual corporate structure, fails to treat Amax uniformly and equally with companies that have a single corporate structure.

In response, the Board presents this statement of the issues:

Did the petitioner prove that the Board's inclusion of taxes and fees in the direct cost ratio was arbitrary, capricious, an abuse of discretion, contrary to constitutional right, or unsupported by substantial evidence?

Did the petitioner prove that the Board's use of a direct cost ratio, as opposed to a total cost ratio, was arbitrary, capricious, an abuse of discretion, contrary to the Board's own rules, or resulted in overvaluation?

Did the petitioner prove that the petitioner's intercompany royalty should be treated differently than any other private royalty?

### FACTS AND BACKGROUND

Amax initiated this litigation to contest the Board's taxable valuation on 1988 coal production from Amax's Eagle Butte and Belle Ayr mines located in Campbell County, Wyoming. At these mines, coal is removed by shovels and loaded onto large haul trucks. As the coal is trucked out of the mine pit, it passes the mouth of the mine. The Board's rules and regulations, which have been adopted in accordance with the Constitution of Wyoming and pertinent Wyoming statutes, provide that the mining of coal is complete at the mouth of the mine. Rules and Regulations of the Wyoming State Tax Commission/State Board of Equalization, the Minerals Division, Department of Revenue and Taxation, Chapter XXI, § 9(a). Amax does not sell coal at the mouth of the mine. Rather, the coal is sold after it leaves the load-out facilities. Chapter 9, § 9(c) of the Board's rules accommodates this circumstance:

(c) Where a mineral is sold away from the mouth of the mine or wellhead pursuant to a bona fide arms length sale, the fair market value shall be determined by the Division in accordance with recognized appraisal techniques.

The Board's rules, at Chapter XXI, § 10, also supply guidance in selecting an appropriate appraisal technique:

### Section 10. *Recognized Appraisal Techniques.*

(a) When the Division is required to appraise or determine the fair cash market value of a mineral by application of recognized appraisal techniques, the Division shall use one or more of the following approaches or a combination thereof:

(i) Cost approach. Applied to minerals, the cost approach is a method of estimating the value of a mineral by determining the total of direct and indirect costs attributable to mining or production of a mineral. Other elements of value include but are not limited to royalty, and return on and of investment.

(ii) Comparison approach. Applied to minerals, the comparison approach is a method of determining the fair cash market value of a mineral by comparison with sales of minerals similar in quality and characteristics. This approach includes consideration of:

(A) Direct arms length sales of unprocessed minerals at the mine or mining claim, and

(B) Direct sales of processed or transported minerals whether at or away from the mine or mining claim.

(b) The Division shall consider whether the sales price includes the value of processing or transportation to market or both added after the mineral has passed beyond the mouth of the mine or wellhead.

(i) If the selling price includes such value, the Division shall deduct such value from the selling price to determine the fair cash market value of the mineral.

(ii) If the value or cost of processing or transportation to market or both is represented by a bona fide arms length contract, such value or cost shall be deemed to be the appropriate deduction from the selling price.

(c) Return on investment may be determined by proportion of costs, the proportion of investment, or rates of return prevalent in the industry.

(d) The Division shall weigh the relative significance, applicability and appropriateness of the indicators of value derived from the approaches to value or methods outlined above, including comparison of value indicators for similar minerals which best approximates the value of the mineral being appraised or valued.

(e) The fair cash market value of a mineral shall not include direct and indirect costs attributable to processing or transportation to market.

The Board's order reflects that:

3. In arriving at the taxable value for 1988 production, the Department used a

proportionate methodology which depends on a cost ratio and the sales price of the mineral product in arriving at the taxable value at the mouth of the mine (point of taxation). The cost ratio consists of a numerator of direct mining costs (less royalties), over a denominator of total direct costs (less royalties). This direct cost ratio is multiplied by the arms-length sales price of the mineral (less royalties). After the multiplication process, any private royalty amount is added back. This multiplication and addition process results in an apportionment of a part of the total sales price and is intended to represent the "taxable value" of the mineral after the mining is complete. The difference between this "taxable value" and the sales price is intended to represent the nontaxable value added to the mineral by processing and transportation after the point of taxation.

Amax asserts the methodology is arbitrary, capricious, an abuse of discretion and not in conformity with law because it does not produce a fair valuation of the coal Amax has produced. In its findings of facts and conclusions of law, the Board articulated this summary of Amax's contentions with regard to the methodology used by the Division to value Amax's product:

> The use of only a direct cost factor is illegal and erroneous. The Department failed to follow its own rules which specify the inclusion of indirect costs. The Department also failed to provide any explicit definition of direct costs, and identified direct costs not by accounting principles but rather on the basis of physical activities such as overburden removal, drilling, blasting, etc. The Department should use a *total cost* factor which relies on the taxpayers' accounting systems to identify all Wyoming profit-bearing costs (both direct and indirect) in both the numerator and the denominator. The Department's factor erroneously apportions indirect costs based upon the arbitrary assumption that indirect costs occur in the same ratio as direct costs. The allocation of indirect costs should not be by a direct cost factor but should be assigned by the taxpayer in compliance with generally accepted accounting principles ("GAAP"). If the taxpayer is allowed to assign indirect costs between mining, transportation and processing, this would result in a more accurate apportionment of these costs and thus a more accurate determination of taxable value. It is erroneous for the Department to rely on a direct cost factor for the apportionment of indirect costs.

Amax also claims that the royalty it pays to its subsidiary, Meadowlark, Inc., should be viewed as a cost of mining and not as a private royalty. The agreement between Amax and Meadowlark is not an arm's length bargain and should, Amax contends, not be treated like private royalties. Amax assigns the royalty (it is an accounting entry, rather than an actual payment) to Meadowlark as a means of "paying" Meadowlark for the services it performs for Amax.[1]

Amax also contends that the Board erred in including Black Lung Excise tax in the assessment formula.

## DISCUSSION

In addressing the issues raised by this appeal, we apply the scope of review enunciated in W.S. 16–3–114(c) (July 1990 Repl.) and the standards set out in the related case, *Amax Coal Company v. Wyoming State Board of Equalization*, 819 P.2d 825, 828–829 (Wyo.1991).

In the instant case, the Board concluded that the Division's proportionate methodology was a valid indicator of value, "inasmuch as costs are a factor that aids and guides an appraiser's evaluation of market value." In reaching its conclusion, the Board relied, in part, upon this court's decision in *Hillard v. Big Horn Coal Company*, 549 P.2d 293 (Wyo.1976). We agree

---

1. Amax Coal Industries is the parent company of Amax Coal Company and Meadowlark, Inc. Amax Coal Company is in the business of mining coal, whereas Meadowlark is in the business of obtaining, holding and managing lands owned or leased by Amax.

that Hillard responds to all the concerns raised by Amax. There, we said:

The coal companies contend, however, that the formula was not followed by the Board. They rely upon testimony of one of their company officials in which he demonstrated how he arrived at a different value by a so-called literal application of the formula. The essential difference between his approach and that of the Board was that his first step was to deduct from the sales price all costs, that is, mining costs, processing costs, and indirect costs, in arriving at a money profit. He then deducted the royalty paid from all of these costs and divided that result into the money profit to determine his per cent of profit. He then applied that per cent of profit to mining costs only and added his product to the mining costs plus the royalty. His method eliminated any allocation of the indirect costs to the mining operations. The Board, on the other hand, attributed a pro rata share of the indirect costs to the mining operations. The Board did not adopt any rules or regulations setting forth interpretations of its minute entry or furnishing instructions with respect to its application. Under these circumstances the construction manifested by the application of the minute entry by the Board is reasonable and certainly not unlawful. The fact that the coal companies' witnesses disagreed with the manner in which the formula was interpreted or disagreed with the result which was reached, is not sufficient to meet the companies' burden of demonstrating that the Board acted fraudulently, arbitrarily, capriciously, or in abuse of its discretion. It simply demonstrates there was a difference of opinion from that held by the members of the Board. *State ex rel. Greenwood v. Pearson* [46 Wyo. 307, 26 P.2d 641 (1933)].

*Hillard*, 549 P.2d at 300.

Amax proposes a valuation methodology which is different from that used by the Division, but it is unable to demonstrate that the method used by the Division violates the applicable review standards. The evidence offered by Amax demonstrates a difference of opinion, as in *Hillard*, and, of course, Amax's model would have the effect of reducing their tax assessments. Amax complains that the Board is incorrect in its reliance on *Hillard* because the question of discrimination was not addressed. That topic, along with all other specific points raised by Amax in this case, was addressed in *Hillard*:

Complaint also is made by the coal companies of the fact that the formula as it is described and interpreted by the Board was applied only to these two companies and one other. The comparative valuation of the product of other mines is then relied upon as showing a lack of uniformity resulting in illegality of the assessment. The Board pragmatically and plausibly meets the argument arising out of the discrepancy in valuations by pointing out that there were similar and proportionate discrepancies in the sales prices of the coals involved. The record demonstrates further that the comparative valuations were made using as a base the valuations reached pursuant to the formula or through an approach which the Board found to be equivalent to the formula. This results in uniformity of assessment, not the lack of uniformity about which the coal companies complain. Granted it does not result in a uniform value for all of the coal mined in the State of Wyoming, but the record demonstrates that the coal mined from different places in the State of Wyoming in fact does have different values. If the valuation of the other coals had not been made in comparison to coals to which the formula have been applied, it then would seem that the Board's position would be a departure from its constitutional and statutory duties. Since the converse is demonstrated by the record, however, the decision of the district court upholding the conclusion of the Board that the valuations properly were arrived at and the correct assessments made, which has the benefit of a presumption of lawfulness, is not shown by the record to be erroneous.

In relying upon a disparity in valuations the coal companies overlook another concept found in *Bunten v. Rock Springs Grazing Ass'n* [29 Wyo. 461, 215 P. 244 (1923)]. The court pointed out that not every discrimination should render an assessment or tax invalid either in whole or in part, and noted that it frequently had been held that omission to assess property either from mistake of law or fact, or accidentally, did not protect other taxpayers from the tax assessed against them.

*Hillard,* 549 P.2d at 300-01.

Amax goes on to claim that the use of indirect costs "creates hypothetical costs" which may not be used in making a valuation. To support this claim, it cites *Appeal of Monolith Portland Midwest Co., Inc.,* 574 P.2d 757 (Wyo.1978). What we said there is:

> The Constitution of the State of Wyoming does not require the inclusion in a cost appraisal formula of hypothetical costs not borne by a particular mining enterprise in order to tax that firm equally and uniformly with those firms which actually do have such costs. Hypothetical costs have no relationship to an armslength sale price which is the value to be established by recognized appraisal techniques where no sale occurs.

*Monolith,* at 761.

The decision does not say that hypothetical costs are per se illegal. But, more importantly, we do not agree with Amax that the method used creates hypothetical costs. Amax itself admitted at the hearing that the costs were not hypothetical. The Division's evaluation of Amax's operations may have produced a different result (number) than did that evaluation which Amax has done—the numbers may be different, but that does not make one hypothetical.

In support of the logic of the method employed by the Division, it quotes 26 C.F.R. § 1.613-4(d)(4)(i) (1980):

> (4) Proportionate profits method. (i) The objective of the "proportionate profits method" of computation is to ascertain gross income from mining by applying the principle that each dollar of the total costs paid or incurred to produce, sell and transport the first marketable product or group of products (as defined in subdivision (iv) of this subparagraph) earns the same percentage of profit. Accordingly, in the proportionate profits method no ranking of costs is permissible which results in excluding or minimizing the effect of any costs incurred to produce, sell and transport the first marketable product or group of products.

>     *     *     *     *     *     *

> (iii) Those costs which are paid or incurred by the taxpayer to produce, sell, and transport the first marketable product or group of products, and which are not directly identifiable with a particular mining process or a particular nonmining process shall, in the absence of a provision of this section providing an apportionment method, be apportioned to mining and nonmining by use of a method which is reasonable under the circumstances. One method which may be reasonable in a particular case is an allocation based on the proportion that the direct costs of mining processes and the direct costs of nonmining processes bear to each other.

The testimony at the hearing before the Board established two possible alternatives for the Board to follow. The Division's expert witness testified that the method of valuation used by the Division yields the fairest results producer to producer and that leaving out production taxes understates value. The cross-examination, as well as questioning done by members of the Board, developed the fact that the use of a valuation formula like that proposed by Amax would result in considerably less uniformity as each coal company came forward with a different method of "accounting" and view of what are direct costs versus indirect costs. Amax complains somewhat that the Division's witness's testimony was short and to the point, but it must also be remembered that all witnesses for Amax were thoroughly cross-examined by the Division's counsel. Amax's witnesses' testimony varied somewhat from place to place. It was Amax's conten-

tion that the valuation method it proposed is "more accurate." Later, its method was described as "a lot more accurate." On the issue of time value of money,[2] one Amax witness conceded that Amax does earn money on tax payments made by customers which are then not paid out until a later date. Counsel for Amax stated Amax could prove without a doubt that it does not earn a profit on taxes collected, but that was not done. Finally, a primary witness for Amax conceded that he did not know if Amax earned a profit on taxes or not, and from the gist of his testimony it can be inferred that Amax is not able, or does not attempt, to keep track of that.

It is readily apparent the Board was presented with two opposing views of what valuation method or methods might properly be used. The Division established that the method it chose was fair. Amax demonstrated that the method it proposed was fair. Both methods are recognized and acceptable appraisal techniques. *See* P. Maxfield, *Taxation of Mining Operations* ¶ 2.03[2][c] (1991); 36 Rocky Mtn.Min. L.Inst., ch. 11 (1990); 34 Rocky Mtn.Min. L.Inst., ch. 2, § 2.03 (1988). We hold that, under the applicable standard of review, *supra*, the Board's decision cannot be impugned.

■ We will be brief in disposing of Amax's contention that the Board's decision to treat the intercompany royalty the same as any other private royalty violated the standards of review we apply in reviewing such a decision. It may be inferred from the testimony presented at the hearing that the principal purposes of the intercompany royalty are to avoid federal income tax to the maximum extent provided by law and to suit the convenience of Amax in accounting for what it perceives as two separate segments of its coal mining activities. The most that can be said of Amax's contentions regarding this issue is that they have a fair degree of credence; indeed, the Division's only witness indicated that he agreed to some extent with Amax's position regarding the intercompany royalty. Nonetheless, the Board decided that it would treat the intercompany royalty like a private royalty and the evidence presented at the hearing provided it with sufficient justification for that decision. The testimony revealed that if Amax and Meadowlark were an integrated company then the profit made by Meadowlark could be included in the assessment process. If they were not integrated, then it would be a cost of mining and would not be included. The Board could fairly infer from the evidence that the relationship between Amax and Meadowlark was essentially an artificial relationship that provided Amax with many benefits. However, one benefit that could fairly be said to not accrue to Amax under these circumstances is that the royalty paid to Meadowlark be treated by the Board any differently than other arm's length, private royalties. Weighing all the factors we are required to weigh in this review process,

---

2. The basic theory of the time value of money is this:

The time value of money is a generic term which encompasses all aspects of converting cash flows at one time to their equivalent values at another time. The starting point is that a dollar today is worth more than a dollar one year from today. Depending upon the problem to be analyzed, the interest rate may be referred to as a discount rate, compounding rate, opportunity cost, cost of capital, yield to maturity, or a growth rate. Whichever name is used, if the problem is one of converting a value at one time to its equivalent value at another time, the basic calculations remain the same.

D. Logue, *Handbook of Modern Finance*, p. 6–2 (1984); and *see* V. VanCaspel, *The Power of Money Dynamics*, pp. 330–31 (1983); V. VanCaspel, *Money Dynamics for the 1990's*, pp. 229–65 (1988).

The penultimate conclusion that must be reached is that if Amax holds money belonging to others over time it does realize a profit or benefit that it would not otherwise realize. Amax stresses that any time value of money there might possibly be would end up being a wash for one reason or another, though in the same breath it is admitted that no such accounting is made by them. The ultimate conclusion, however, is that in the absence of convincing evidence (as opposed to creative accounting testimony), we conclude that the Board could fairly infer that tax monies received by Amax and later paid out are a legitimate value to be considered in the assessment process.

we hold the Board's decision is sustainable under the standard of review.

Finally, Amax also raised as an issue the inclusion of Black Lung Excise Tax in the valuation in this case. The related case, *Amax Coal*, 819 P.2d at 834, disposed of this issue, and our decision in that case also governs here.

The decision of the Board is, therefore, affirmed in all respects.