2007 WY 16

RME PETROLEUM COMPANY,
Appellant (Petitioner),

v.

WYOMING DEPARTMENT OF
REVENUE, Appellee
(Respondent).

Chevron U.S.A., Inc., Appellant
(Petitioner),

v.

Department of Revenue, State
of Wyoming, Appellee
(Respondent).

The Louisiana Land and Exploration Company; and Burlington Resources Oil & Gas Co., LP, Appellants (Petitioners),

v.

Wyoming Department of Revenue; and Board of County Commissioners of the County of Fremont, Appellees (Respondents).

Nos. 04–185, 04–190, 04–204.

Supreme Court of Wyoming.

Jan. 26, 2007.

674

Representing Appellants RME, The Louisiana Land and Exploration Company, and Burlington Resources Oil & Gas Co. LP: Lawrence J. Wolfe, Patrick R. Day, and Walter F. Eggers, III, of Holland & Hart, LLP, Cheyenne, Wyoming. Argument by Mr. Wolfe.

Representing Appellant Chevron U.S.A., Inc.: William J. Thomson, III, Randall B. Reed, and Brian J. Hanify, of Dray, Thomson & Dyekman, P.C., Cheyenne, Wyoming. Argument by Mr. Thomson.

Representing Appellee: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; Karl D. Anderson, Senior Assistant Attorney General; Cathleen D. Parker, Senior Assistant Attorney General. Argument by Mr. Anderson.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

BURKE, J.

[¶ 1] In three consolidated appeals, RME Petroleum Company, Chevron U.S.A., Inc., Louisiana Land and Exploration Company, and Burlington Resources Oil & Gas Co., LP, ("Taxpayers"), challenge taxation and valuation determinations made by the Department of Revenue ("Department"). Taxpayers' appeals involve oil and gas production valued under the statutory proportionate profits method as stated in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D).

* Chief Justice at time of oral argument.

[¶ 2] Taxpayers pursued appeals before the Wyoming State Board of Equalization ("Board"). The Board upheld the Department's determinations, finding in each instance that production taxes and royalties must be treated as "direct costs of producing" in the proportionate profits formula. We conclude the Board's interpretation of the statute was erroneous and reverse the orders of the Board.

## ISSUES

[¶ 3] Louisiana Land and Exploration Company and Burlington Resources Oil & Gas Co., LP, (collectively "Burlington"), present these issues:

1) Pursuant to properly promulgated rules the Department of Revenue has defined "direct costs of producing" in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) to exclude taxes and royalties. This rule is binding upon both the State Board of Equalization and the Department of Revenue. Both agencies have chosen to ignore the rule, and thereby exceeded their statutory authority.

2) Taxes and royalties are not "direct costs of producing" under the proportionate profits valuation method set forth in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D).

3) The Board erred in allowing Fremont County to intervene in Burlington's tax appeals.

RME Petroleum Company adopts the issues presented by Burlington, and states three additional issues:

1) This Court's decision in *Hillard v. Big Horn Coal*, 549 P.2d 293 (Wyo.1976) does not support the Board's conclusion that taxes and royalties are "direct costs of producing."

2) The actions of the 2002 Legislature on Senate File 69 do not support the Board's position.

3) As a tax statute, Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) must be strictly construed.

Chevron U.S.A., Inc. presents the following issues:

1) Whether the Board erred as a matter of law in concluding that Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) unambiguously includes exempt royalties, nonexempt royalties, and production taxes as a direct cost of producing despite the fact that the statute neither includes nor excludes them as a direct cost of producing.

2) Whether the Board erred as a matter of law when interpreting Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) to include production taxes, exempt royalties, and nonexempt royalties as a "direct cost of producing," when that interpretation is contrary to the Department's rule and previous policy, is contrary to the legislative history of the statute, results in taxation of exempt federal royalties, and is contrary to canons of statutory construction.

3) Whether Chevron was denied its constitutional right to uniform and equal taxation because it was treated disparately from other producer/processors of natural gas that reported taxable values for production years 1993–1995, and because oil and gas producers are treated differently from other mineral taxpayers within the same class.

In response, the Department of Revenue phrases the issues in each of the three appeals as:

1) Did the State Board of Equalization properly affirm the Department of Revenue's application of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D), in which the Department classified production taxes and royalties as direct production costs within the direct cost ratio?

2) Was the Department of Revenue required to institute new rules to correct its previous erroneous interpretation and application of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D)?

3) Did the Supreme Court's decision in *Amoco Prod. Co. v. Wyoming Dep't of Revenue*, 2004 WY 89, 94 P.3d 430 (Wyo. 2004), foreclose the Department of Revenue's determination that production taxes and royalties are a direct cost of producing within the direct cost ratio of the proportionate profits method?

4) Did the State Board properly affirm the Department of Revenue's determination that exclusion of production taxes and royalties from the direct cost ratio produces an absurd result and a taxable value which is less than fair market value?

## FACTS

### The Board's decision in Amoco 96–216

[¶ 4] In this case the parties and the Board refer to earlier proceedings involving a different taxpayer that addressed the issue presented in the instant case. In order to understand the procedural developments that led to these appeals and for ease of reference throughout this opinion, we will briefly describe what is referred to as *"Amoco 96–216."* In an administrative appeal concerning Amoco Production Company's Whitney Canyon production for years 1990 through 1992, the Board considered the classification of direct costs of production in the oil and gas proportionate profits formula. *See Amoco Production Co. v. Dept. of Revenue,* 2004 WY 89, ¶¶ 3–4, 94 P.3d 430, 434–35 (Wyo.2004). The Board allowed Uinta County to intervene and argue that production taxes and royalties should be treated as direct costs of producing in the statutory proportionate profits formula. In proceedings before the Board, the Department aligned with the taxpayer and argued that production taxes and royalties should not be included in the direct cost ratio. The Board issued its decision, *Amoco 96–216,* on June 29, 2001. The Board rejected the approach urged by Amoco and the Department and concluded that royalties and production taxes are direct costs of producing for purposes of applying the oil and gas proportionate profits formula. *Id.,* ¶ 5, 94 P.3d at 435.

[¶ 5] When *Amoco 96–216* was appealed to this Court, the Department changed its position and accepted the ruling of the Board. Upon review, we concluded that the county should not have been allowed to intervene. *Amoco Production Co.,* ¶ 26, 94 P.3d at 442. For that reason, we vacated the portion of

the Board's decision that addressed the direct cost ratio issue raised by the county without specifying how royalties and production taxes should be treated under the proportionate profits formula in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D). *Id.,* ¶ 54, 94 P.3d at 450. Although *Amoco 96–216* was vacated, the Department thereafter administered Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) in accordance with the Board's decision.

### # 04–185 RME

[¶ 6] During production years 1996 and 1997, RME was the operator of the Brady Unit in Sweetwater County. RME's oil and gas production from the Brady Unit was valued by the Department under the proportionate profits method. When RME reported its production, it did not classify production taxes and royalties as direct costs of production. Following an audit and the Board's decision in *Amoco 96–216,* the Department assessed additional severance taxes, based upon an inclusion of production taxes and royalties as direct costs of production under the proportionate profits valuation method. RME appealed to the State Board of Equalization. The appeal was expedited, and the parties stipulated to the pertinent facts. RME asserted that production taxes and royalties should not be considered direct costs of producing in applying the proportionate profits formula. The Board rejected RME's position and issued its Findings of Fact, Conclusions of Law, Decision and Order on November 20, 2003.

### # 04–190 Chevron

[¶ 7] From 1993 to 1995, Chevron produced oil and gas from property in Uinta and Lin-

coln Counties.[1] Production from these areas was valued under the proportionate profits method. Chevron did not include royalties or production taxes in the direct cost ratio when it reported its production for 1993, 1994, and 1995, in accordance with the Department's policy at the time. In 1999, the Department of Audit initiated audits of Chevron's production for the tax years 1993–1995. While the final results of the audit were pending, the Board issued *Amoco 96–216.*[2] Subsequently, the Department of Audit issued its final determination letters, including production taxes and royalties in the direct cost ratio. The Department of Revenue assessed additional severance taxes, interest, and increased the ad valorem taxable value of the properties.

[¶ 8] In three appeals to the State Board of Equalization, Chevron challenged the additional assessments for the 1993–1995 production years. Chevron's appeals were consolidated and were placed on the Board's expedited docket to be decided on stipulated facts and briefing by the parties.[3] The Board issued its Findings of Fact, Conclusions of Law, Decision and Order on June 2, 2004, upholding the Department's determinations but ordering that interest accrue only from the date *Amoco 96–216* was issued.

### # 04–204 Burlington

[¶ 9] Burlington operates the Lost Cabin Gas Plant in Fremont County where it processes its production from the Madden Deep Unit. In 2002, the Department valued Burlington's 2001 mineral production for assessment purposes under the proportionate

---

1. The properties were identified as the Whitney Canyon field, the Painter Reservoir field, the East Painter Reservoir field, the Ryckman Creek field, and the Clear Creek field in Uinta County, and the Carter Creek field located in Uinta and Lincoln Counties.

2. The preliminary findings of the audit did not include production taxes and royalties in the direct cost ratio.

3. Chevron and the Department stipulated as follows:
   Chevron was the only producer/processor of natural gas in Wyoming for which the Depart-

ment determined during the audit that production taxes and exempt and non-exempt royalties should be included as "direct costs of producing" in the direct cost ratio under the proportionate profits formula for the production years 1993 through 1995, and the only producer/processor in Wyoming that has received a tax assessment from the Department and/or a tax bill from a county on mineral production for production years 1993, 1994, and 1995 that calculates the taxable value with production taxes and exempt and non-exempt royalties included in the direct cost ratio.

profits formula. The Department included production taxes and royalties as direct costs of producing in the formula. Burlington appealed to the Board. Two other appeals before the Board related to amended returns Burlington filed with the Department for oil and gas production in 1998 and 1999. Subsequently, the Department notified Fremont and Natrona Counties of valuation changes for 1998 and 1999. The Department's valuation treated royalties and production taxes as direct costs of producing under the proportionate profits formula. Burlington objected to the notices.

[¶ 10] The three appeals were consolidated, and the Board allowed Fremont County to intervene. The parties waived a contested case hearing, and the cases were assigned to the Board's expedited docket to be decided upon stipulated facts and the parties' briefs. The Board issued its Findings of Fact, Conclusions of Law and Order on May 10, 2004. It upheld the Department's treatment of royalties and production taxes under the proportionate profits formula and determined that Fremont County's intervention had been proper.

[¶ 11] In each of its decisions against Taxpayers, the Board relied upon its decision in *Amoco 96–216* and determined that Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) requires royalties and production taxes to be treated as direct costs of production. RME appealed to the Third Judicial District in Sweetwater County. Chevron appealed to the Third Judicial District in Uinta County. Burlington appealed to the Ninth Judicial District in Fremont County. Those district courts certified the cases to this Court pursuant to W.R.A.P. 12.09(b). We accepted each of the cases as certified and consolidated them for argument and decision.

### STANDARD OF REVIEW

[¶ 12] When reviewing cases certified pursuant to W.R.A.P. 12.09(b), we apply appellate standards which are applicable to the court of the first instance. *Powder River Coal v. State Bd. of Equalization,* 2002 WY 5, ¶ 5, 38 P.3d 423, 426 (Wyo.2002). Our review is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005), which provides:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 13] At issue in this case is the proper interpretation of the statutory proportionate profits formula. This presents a question of law which we review *de novo. Chevron U.S.A., Inc. v. State,* 918 P.2d 980, 983 (Wyo.1996). We affirm an agency's conclusions of law when they are in accordance with the law. *Powder River Coal,* ¶ 6, 38 P.3d at 426. However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error. *Id.*

### DISCUSSION

[¶ 14] Wyoming taxes mineral production pursuant to Article 15, Section 11 of the

Wyoming Constitution.[4] The legislature is directed to define full value for the classes of property and to enact laws securing "a just valuation for taxation of all property ...." *Id.* All taxation must be "equal and uniform within each class of property." *Id.* In fulfillment of these constitutional mandates, the legislature has charged the Department of Revenue with determining the fair market value of oil and gas production for severance tax purposes. Wyo. Stat. Ann. § 39–14–202(a)(i) (LexisNexis 2005). The Department's determination of fair market value also establishes fair market value for ad valorem tax purposes. Wyo. Stat. Ann. § 39–13–103(b)(iv) (LexisNexis 2005).[5] The Department must value oil and gas in accordance with Wyo. Stat. Ann. § 39–14–203(b).[6] Wyo.

**4.** Article 15, Section 11 states:

(a) All property, except as in this constitution otherwise provided, shall be uniformly valued at its full value as defined by the legislature, in three (3) classes as follows:
(i) Gross production of minerals and mine products in lieu of taxes on the land where produced;
(ii) Property used for industrial purposes as defined by the legislature; and
(iii) All other property, real and personal.
(b) The legislature shall prescribe the percentage of value which shall be assessed within each designated class. All taxable property shall be valued at its full value as defined by the legislature except agricultural and grazing lands which shall be valued according to the capability of the land to produce agricultural products under normal conditions. The percentage of value prescribed for industrial property shall not be more than forty percent (40%) higher nor more than four (4) percentage points more than the percentage prescribed for property other than minerals.
(c) The legislature shall not create new classes or subclasses or authorize any property to be assessed at a rate other than the rates set for authorized classes.
(d) All taxation shall be equal and uniform within each class of property. The legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal.

**5.** Wyo. Stat. Ann. § 39–13–103(b)(iv) provides:

The fair market value determined by the department pursuant to W.S. 39–11–101(a)(vi) and 39–14–101 through 39–14–711 pertaining to the valuation of the gross product of mines and mining claims, and paragraph (xvi) of this subsection as it pertains to the valuation of rail car companies, shall be the fair market value for purposes of the tax imposed by this chapter on the property described in W.S. 39–13–102(m);
Pursuant to Wyo. Stat. Ann. § 39–11–101(a)(vi), the "fair market value of mine products shall be determined as provided by W.S. 39–14–103(b), 39–14–203(b), 39–14–303(b), 39–14–403(b), 39–14–503(b), 39–14–603(b) and 39–14–703(b)[.]"

**6.** The text of Wyo. Stat. Ann. § 39–14–203(b) (LexisNexis 2005) provides:

(b) Basis of tax. The following shall apply:

(i) Crude oil, lease condensate and natural gas shall be valued for taxation as provided in this subsection;
(ii) The fair market value for crude oil, lease condensate and natural gas shall be determined after the production process is completed. Notwithstanding paragraph (x) of this subsection, expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the mineral;
(iii) The production process for crude oil or lease condensate is completed after extracting from the well, gathering, heating and treating, separating, injecting for enhanced recovery, and any other activity which occurs before the outlet of the initial storage facility or lease automatic custody transfer (LACT) unit;
(iv) The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first;
(v) If the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection are sold to a third party, or processed or transported by a third party at or prior to the point of valuation provided in paragraphs (iii) and (iv) of this subsection, the fair market value shall be the value established by bona fide arms-length transaction;
(vi) In the event the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection is not sold at or prior to the point of valuation by bona fide arms-length sale, or, except as otherwise provided, if the production is used without sale, the department shall identify the method it intends to apply under this paragraph to determine the fair market value and notify the taxpayer of that method on or before September 1 of the year preceding the year for which the method shall be employed. The department shall determine the fair market value by application of one (1) of the following methods:
(A) Comparable sales—The fair market value is the representative arms-length market

Stat. Ann. § 39–11–101(a)(vi) (LexisNexis 2005).

[¶ 15] We have recognized that the Department has been assigned administrative functions relating to taxation and revenue that were previously the responsibilities of the Board. *Amoco Production Co.,* ¶ 22, 94 P.3d at 440; *Union Pacific Resources Co. v. State,* 839 P.2d 356, 363 (Wyo.1992). Currently, the Board is "an independent quasi-judicial organization with constitutional and statutory duties to equalize valuation and decide disagreements regarding statutory

> price for minerals of like quality and quantity used or sold at the point of valuation provided in paragraphs (iii) and (iv) of this subsection taking into consideration the location, terms and conditions under which the minerals are being used or sold;
> (B) Comparable value—The fair market value is the arms-length sales price less processing and transportation fees charged to other parties for minerals of like quantity, taking into consideration the quality, terms and conditions under which the minerals are being processed or transported;
> (C) Netback—The fair market value is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees. The netback method shall not be utilized in determining the taxable value of natural gas which is processed by the producer of the natural gas;
> (D) Proportionate profits—The fair market value is:
> (I) The total amount received from the sale of the minerals minus exempt royalties, nonexempt royalties and production taxes times the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals; plus
> (II) Nonexempt royalties and production taxes.
> (vii) When the taxpayer and department jointly agree, that the application of one (1) of the methods listed in paragraph (vi) of this subsection does not produce a representative fair market value for the crude oil, lease condensate or natural gas production, a mutually acceptable alternative method may be applied;
> (viii) If the fair market value of the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection is determined pursuant to paragraph (vi) of this subsection, the method employed shall be used in computing taxes for three (3) years including the year in which it is first applied or until changed by mutual agreement between the department and taxpayer. If the taxpayer believes the valuation method

provisions affecting the assessment, levy and collection of taxes." *Amoco Production Co.,* ¶ 22, 94 P.3d at 440; *Amoco Production Co. v. Wyoming State Bd. of Equalization,* 12 P.3d 668, 672 (Wyo.2000). The legislature has limited the Department's methodology to selection of one of four statutory methods, or to another method agreeable to the Taxpayer. *BP America Production Co. v. Dept. of Revenue,* 2005 WY 60, ¶ 5, 112 P.3d 596, 600 (Wyo.2005); Wyo. Stat. Ann. § 39–14–203(b) (LexisNexis 2005).[7] The Department must notify the taxpayer of the method selected, or the taxpayer selects a method, and the

> selected by the department does not accurately reflect the fair market value of the crude oil, lease condensate or natural gas, the taxpayer may appeal to the board of equalization for a change of methods within one (1) year from the date the department notified the taxpayer of the method selected;
> (ix) If the department fails to notify the taxpayer of the method selected pursuant to paragraph (vi) of this subsection, the taxpayer shall select a method and inform the department. The method selected by the taxpayer shall be used in computing taxes for three (3) years including the year in which it is first applied or until changed by mutual agreement between the taxpayer and the department. If the department believes the valuation technique selected by the taxpayer does not accurately reflect the fair market value of the crude oil, lease condensate or natural gas, the department may appeal to the board of equalization for a change of methods within one (1) year from the date the taxpayer notified the department of the method selected;
> (x) If crude oil is enhanced prior to the point of valuation as defined in paragraph (iii) of this subsection by either a blending process with a higher grade hydrocarbon or through a refining process such as cracking, then the fair market value shall be the fair market value of the crude oil absent the blending or refining process;
> (xi) For natural gas, the total of all actual transportation costs from the point where the production process is completed to the inlet of the processing facility or main transmission line shall not exceed fifty percent (50%) of the value of the gross product without approval of the department based on documentation that the costs are due to environmental, public health or safety considerations, or other unusual circumstances.
> * * *

7. In situations where a producer also processes gas, as do the Taxpayers, one of the methods—netback—is not available. Wyo. Stat. Ann. § 39–14–203(b)(vi)(C) (LexisNexis 2005).

selected method will then be used for three consecutive tax years. Wyo. Stat. Ann. § 39–14–203(b)(viii) and (ix).

[¶ 16] The proportionate profits method of valuation is one of the methods authorized by statute to value crude oil, lease condensate, or natural gas production not sold in a bona fide arms-length sale at or prior to the point of valuation. Wyo. Stat. Ann. § 39–14–203(b)(vi). That method is set forth at Wyo. Stat. Ann. § 39–14–203(b)(vi)(D), which states:

> (D) Proportionate profits—The fair market value is:
>
> (I) The total amount received from the sale of the minerals minus exempt royalties, nonexempt royalties and production

taxes times the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals; plus

> (II) Nonexempt royalties and production taxes.

The parties use the term "direct cost ratio" as shorthand for the statutory language: "the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals."

[¶ 17] The language of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) is perhaps better understood when expressed as a mathematical formula:

The issue in this case is whether royalties (both exempt and non-exempt) and production taxes are "direct costs of producing," properly included in both the numerator and denominator of the direct cost ratio.

[¶ 18] The components of the direct cost ratio are not defined within Wyo. Stat. Ann. § 39–14–203(b).[8] "Production taxes" are not defined in the statute, but the parties here do not dispute what is meant by that term.[9] The statute also does not define royalties,

but "[w]e assume the legislature was well aware of the accepted legal definition and usage of the term royalty" as a universally recognized real property right. *Powder River Coal*, ¶ 17, 38 P.3d at 429. Royalties and production taxes are specifically addressed in other parts of the formula, before and after the direct cost ratio is applied. Royalties and production taxes are subtracted before application of the direct cost ratio, then nonexempt royalties and production taxes are added back in as the final step in the formu-

---

8. Processing, however, is defined by Wyo. Stat. Ann. § 39–14–201(a)(xviii) (LexisNexis 2005):

"Processing" means any activity occurring beyond the inlet to a natural gas processing facility that changes the well stream's physical or chemical characteristics, enhances the marketability of the stream, or enhances the value of the separate components of the stream. Processing includes, but is not limited to fractionation, absorption, adsorption, flashing, refrigeration, cryogenics, sweetening, dehydration within a processing facility, beneficiation, stabilizing, compression (other than production compression such as reinjection, wellhead

pressure regulation or the changing of pressures and temperatures in a reservoir) and separation which occurs within a processing facility;

Similar definitions for "producing" and "transporting" do not appear in the definitional provisions of Wyo. Stat. Ann. § 39–14–201(a).

9. The Department has defined production taxes, and for purposes of this opinion, that includes severance taxes, ad valorem taxes, and oil and gas conservation taxes authorized by Wyoming statutes. DOR Rules, Ch. 6, § 4(n).

la.[10]

[¶ 19] The proportionate profits method arrives at a taxable value for oil and gas by providing for a cost ratio of direct expenses to apply to a taxpayer's sales revenue. We have explained the general operation of the formula: "[U]nder the proportionate profits method of valuation, any increase in direct production costs increases tax liability." *Amoco Production Co.*, ¶ 28, 94 P.3d at 442. We observe, for purposes of this opinion, that including production taxes and royalties in the direct cost ratio as direct costs of production results in greater tax liability.

[¶ 20] The Department promulgated a rule defining "direct costs of producing" not long after Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) was enacted. Section 4b of Chapter 6 of the Department's rules and regulations provides:

> (w) "Direct costs of producing" includes labor for field and production personnel whose primary responsibility is extraction of crude oil, lease condensate, natural gas and other mineral products removed from the production stream before processing; materials and supplies used for and during the production process; depreciation expense for field equipment used to take the production stream from the wellhead to the point of valuation; fuel, power and other utilities used for production and maintenance; gathering and transportation expenses from the wellhead to the point of valuation; ad valorem taxes on production and transportation equipment; intangible drilling costs, including dry hole expense; and other direct costs incurred prior to the point of valuation that are specifically attributable to producing mineral products.

DOR Rules, Ch. 6, § 4b(w) ("Rule § 4b"). The language of the rule, which does not mention royalties or production taxes, has remained unchanged. 011–000–006 Weil's Code Wyo. R. § 4b(w) (1995). For a number of years following the enactment of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) and the promulgation of Rule § 4b, the Department did not view production taxes and royalties as fitting within the definition provided by the rule.

[¶ 21] However, when the Board's decision in *Amoco 96–216* was appealed, the Department abandoned its prior administration of the proportionate profits formula. As we noted in *Amoco*, the Department informed the Court that it "accepted the ruling of the Board on this issue and has informed all affected taxpayers to include production taxes and royalties as direct production costs." *Amoco Production Co.*, ¶ 26, 94 P.3d at 441. Without altering the language of Rule 4b, the Department thereafter treated royalties and taxes as "direct costs of producing." Taxpayers' consolidated appeals arose in the midst of this administrative about-face.

[¶ 22] In Taxpayers' appeals challenging the Department's current approach to the direct cost ratio, the Board reiterated the reasoning it employed in *Amoco 96–216*. The Board found the language of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) unambiguous in requiring that royalties and taxes are direct costs of producing and must be included as such in the direct cost ratio. Taxpayers made varying arguments to the Board, resulting in three orders which are not identical but share the same ultimate conclusion.

[¶ 23] As support for its decision in each of Taxpayers' cases, the Board quoted and relied upon findings from its order in *Amoco 96–216*,

> In determining whether royalties and production taxes are to be included as direct production costs in calculating the direct cost ratio, we consider the omission of certain words intentional on the part of the legislature, and we may not add omitted words. *Parker v. Artery*, 889 P.2d 520

---

**10.** Exempt royalties are not added back in, reflecting a clear legislative intent that exempt royalties be excluded from taxable value. The exclusion of exempt royalties is consistent with Article 15, Section 12 of the Wyoming Constitution, which provides:

> The property of the United States, the state, counties, cities, towns, school districts and municipal corporations, when used primarily for a governmental purpose, and public libraries, lots with the buildings thereon used exclusively for religious worship, church parsonages, church schools and public cemeteries, shall be exempt from taxation, and such other property as the legislature may by general law provide.

(Wyo.1995); *Fullmer v. Wyoming Employment Security Comm'n.*, 858 P.2d 1122 (Wyo.1993). Particularly, when the language appears in one section of a statute but not another, we will not read the omitted language into the section where it is absent. *Matter of Voss' Adoption*, 550 P.2d 481 (Wyo.1976). Wyoming Statute § 39–2–208(d)(iv) is clear and unambiguous. It does not require statutory interpretation to understand that royalties and production taxes are not specifically excluded as a direct cost. The legislative intent is clear. Considering that inclusion of royalties and production costs in the direct cost formula reaches the closest calculation to what are actual costs, the clear reading of the statute is the most realistic result and there is no need to resort to legislative intent.

The legislature specifically excluded royalties and production taxes from the definition of direct costs to be used for purposes of the direct cost ratio used in valuing coal under the proportionate profits methodology. *Wyo. Stat. § 39–2–209(d)(iv)*. Likewise, the legislature specifically excluded royalties and production taxes as direct costs to be used in the formula calculation for valuation of bentonite. *Wyo. Stat. § 39–2–211(d)(i)(c)*. By excluding these costs in the other mineral valuation statutes, the legislature clearly evidenced its understanding that royalties and production taxes are direct costs of production. Because the legislature did not exclude royalties and production taxes from the direct cost of production of oil and gas, we conclude they must be included.

[¶ 24] In these consolidated appeals, Taxpayers have taken different approaches to challenging the Board's ultimate conclusion, coordinating their arguments to cover a spectrum of sub-issues. In our discussion, a reference to an argument asserted by Taxpayers may be one which was only briefed by one Appellant but is not unfairly generalized to reflect Taxpayers' position overall. Ultimately, Taxpayers argue that the Board misinterpreted Wyo. Stat. Ann. § 39–14–203(b)(vi)(D).

[¶ 25] We have not previously construed Wyo. Stat. Ann. § 39–14–203(b)(vi) to determine the components of the direct cost ratio. We turn to our well-established rules of statutory interpretation. The paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. *State ex rel. State Department of Revenue v. Union Pac. R.R. Co.*, 2003 WY 54, ¶ 12, 67 P.3d 1176, 1182 (Wyo.2003). We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. *Id.* A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. *Id.* If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute. *Petroleum Inc. v. State Bd. of Equalization*, 983 P.2d 1237, 1240 (Wyo.1999).

[¶ 26] Taxpayers assert that the statute is ambiguous because direct costs of producing are not defined. They contend the ambiguity should be resolved in their favor and in accordance with Rule § 4b. Alternatively, if we find the statute unambiguous, Taxpayers argue that the Board's interpretation was wrong. According to Taxpayers, the specific mention of royalties and production taxes in the first and final steps of the statutory formula demonstrates that those items are not intended to be included in the direct cost ratio.

[¶ 27] In response, the Department argues that the statute is not ambiguous in requiring royalties and taxes to be included in the direct cost ratio. The Department reasons that direct costs of producing must include those items which are required to be paid in order for oil and gas to be produced, and producing oil and gas results in the payment of royalties and taxes. Adopting the reasoning of the Board, the Department argues that the specific exclusion of royalties and production taxes from the direct cost definitions in similar statutes for coal and bentonite reflects an unambiguous intent that those

items be included in the oil and gas direct cost ratio.

[¶ 28] We have recognized that divergent opinions among parties as to the meaning of a statute may be evidence of ambiguity but is not conclusive. *UPRC*, ¶ 12, 67 P.3d at 1182–83. Additionally, the Department's struggle to administer Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) seems to indicate a lack of clarity concerning the statute's meaning. However, administrative ambivalence, alone, does not create ambiguity. *Amoco v. State Bd. of Equalization*, 797 P.2d 552, 555 (Wyo.1990) ("Whether the statute was applied in an inconsistent manner is a different question from whether the statute itself is ambiguous."). Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court. *UPRC*, ¶ 12, 67 P.3d at 1183.

[¶ 29] The plain language of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) does not specify that royalties and production taxes are to be either included or excluded as direct costs of producing. Neither of the interpretations urged by the parties is unreasonable, and either reading of the statute supplies a plausible legislative intent. Accordingly, we find the statutory proportionate profits formula susceptible to varying meanings, and therefore, ambiguous.

[¶ 30] The Department makes several arguments in support of the Board's finding of an unambiguous legislative intent to include royalties and production taxes in the direct cost ratio. We will address these arguments in order to explain why the Board's finding was in error. First, the Department asserts that we can find a clear statement of legislative intent by comparing the language in the statutory formulas for coal and bentonite with Wyo. Stat. Ann. § 39–14–203(b)(vi)(D). Sections 39–14–103(b)(vii) (LexisNexis 2005) and 39–14–403(b)(iv)(A) (LexisNexis 2005) of the Wyoming Statutes authorize proportionate profits methods to value coal and bentonite. These provisions were enacted in the same legislative session as Wyo. Stat. Ann. § 39–14–203(b)(vi)(D), as part of the overhaul of Wyoming's taxation system. 1990 Wyo. Sess. Laws ch. 54.[11] We are able to discern some cohesive and harmonious intent reflected in the statutes pertaining to mine product taxes from the parallel structure of Chapter 14 of Title 39 of the Wyoming Statutes.[12] However, comparative review of these other formulas only confirms the ambiguity presented by Wyo. Stat. Ann. § 39–14–203(b)(vi)(D).

[¶ 31] We have had several opportunities to delve into classification of costs under Wyo. Stat. Ann. § 39–14–103(b), the statutory proportionate profits formula for coal. *Powder River Coal v. Dept. of Revenue*, 2006 WY 137, 145 P.3d 442 (Wyo.2006); *Powder River Coal*, 38 P.3d 423; *Wyodak Resources Dev. Corp. v. State Bd. of Equalization*, 9 P.3d 987, 990 (Wyo.2000).[13] We have recognized

---

11. Wyoming's tax structure changed significantly following this Court's decision in *Rocky Mountain Oil and Gas Ass'n v. State Bd. of Equalization*, 749 P.2d 221 (Wyo.1987) and subsequent constitutional amendments. *See Union Pacific Resources Co.*, 839 P.2d at 361. The changes reflected the holding in *Rocky Mountain Oil and Gas* that defining taxable value is a legislative function that cannot be delegated. *Rocky Mountain Oil and Gas Ass'n*, 749 P.2d at 241. *See* 1990 Wyo. Sess. Laws ch. 54; 1991 Wyo. Sess. Laws ch. 174.

In 1998, the legislature repealed and recodified its original enactments of these provisions, as well as many other tax administration provisions enacted during the 1990 legislative session. 1998 Wyo. Sess. Laws ch. 5, §§ 4–6; *See also* Wyo. Stat. Ann. § 39–2–208 (Michie 1997) (repealed). Other than renumbering and reorganization, no substantive changes occurred which impact our decision in this case. Accordingly, this opinion refers to the current codification of the cited statutes.

12. Chapter 14 of Title 39 of the Wyoming Statutes provides for mine product taxes, and within that chapter, Articles 1, 2 and 4, relate to coal, oil and gas, and bentonite, respectively. These articles are similarly structured. Each article first provides definitions. *See* Wyo. Stat. Ann. §§ 39–14–101, –201, and–401. The second statute in each article is the administrative provision. *See* Wyo. Stat. Ann. §§ 39–14–102, –202, and –402. The third provision in each article is the imposition statute, including the proportionate profits formulas under subsection (b). *See* Wyo. Stat. Ann. §§ 39–14–103, –203, and –403.

13. Earlier cases also discussed the proportionate profits type of valuation methodology. Such approaches to valuing coal predate the current mineral taxation statutory scheme. *E.g., Amax Coal Co. v. Board of Equalization*, 819 P.2d 834,

that the proportionate profits formula for coal is a modification of a method used by the Internal Revenue Service, with the stated objective of ascertaining "gross income from mining by applying the principle that each dollar of the total costs paid or incurred to produce, sell, and transport the first marketable product ... earns the same percentage of profit. 26 C.F.R. § 1.613–4(d)(4) (2001)." *Powder River Coal,* ¶ 8, 38 P.3d at 427. Recently, we commented:

> While we can assume the legislature believed it was putting to rest all of the debate concerning mineral valuation when it completely revamped the mineral taxation statutes in 1990, the industry, the responsible agencies, and the courts continue to be faced with a seemingly never-ending series of scenarios calling into question what the legislature intended with regard to the categorization of costs in the context of the proportionate profits method of valuation. Given our charge is to discern legislative intent, we must glean what we can from the sometimes meager statutory language.

*Powder River Coal,* ¶ 12, 145 P.3d at 447.

[¶ 32] Our task in this case is even more challenging because the language of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) is scant compared to that of its coal counterpart. The coal formula is set forth in Wyo. Stat. Ann. § 39–14–103(b)(vii), which provides:

> For coal sold away from the mouth of the mine pursuant to a bona fide arms-length sale, the department shall calculate the fair market value of coal by multiplying the sales value of extracted coal, less transportation to market provided by a third party to the extent included in sales value, all royalties, ad valorem production taxes, severance taxes, black lung excise taxes and abandoned mine lands fees, by the ratio of direct mining costs to total direct costs. Nonexempt royalties, ad valorem production taxes, severance taxes, black lung excise taxes and abandoned mine lands fees shall then be added to determine fair market value.

Unlike the oil and gas proportionate profits formula, the components of the coal formula are defined by the statute:

> For purposes of this paragraph:
>
> (A) The sales value of extracted coal shall be the selling price pursuant to an arms-length contract. To the extent not included in the selling price pursuant to an arms-length contract, and to the extent that the following represent partial consideration for the value of the coal, sales value shall include the value per ton attributable to the extracted coal for any consideration provided to the seller in the form of heat content adjustments, price escalations or de-escalations, expense reimbursements, capital, facilities or equipment, services for mining, handling, processing or transporting the coal at or near the mine site, or any payment received for the current or past sale of extracted coal, by or on behalf of the purchaser. Sales value per ton shall include consideration provided for the deferral of extraction and sale in the taxable period in which the purchaser receives credit for the payment as a result of subsequent extraction and sale of the deferred production;
>
> (B) Direct mining costs include mining labor including mine foremen and supervisory personnel whose primary responsibility is extraction of coal, supplies used for mining, mining equipment depreciation, fuel, power and other utilities used for mining, maintenance of mining equipment, coal transportation from the point of severance to the mouth of the mine, and any other direct costs incurred prior to the mouth of the mine that are specifically attributable to the mining operation;
>
> (C) Total direct costs include direct mining costs determined under subparagraph (B) of this paragraph plus mineral processing labor including plant foremen and supervisory personnel whose primary responsibility is processing coal, supplies used for processing, processing plant and equipment depreciation, fuel, power and other utilities used for processing, maintenance of processing equipment, coal transporta-

839 (Wyo.1991); *Hillard v. Big Horn Coal Company,* 549 P.2d 293 (1976); *C F & I Steel Corp. v.* *State Board of Equalization,* Wyo., 492 P.2d 529 (1972).

tion from the mouth of the mine to the point of shipment, coal transportation to market to the extent included in the price and provided by the producer, and any other direct costs incurred that are specifically attributable to the mining, processing or transportation of coal up to the point of loading for shipment to market;

**(D) Indirect costs, royalties, ad valorem production taxes, severance taxes, black lung excise taxes and abandoned mine lands fees shall not be included in the computation of the ratio set forth in this paragraph.** Indirect costs include but are not limited to allocations of corporate overhead, data processing costs, accounting, legal and clerical costs, and other general and administrative costs which cannot be specifically attributed to an operational function without allocation.

Wyo. Stat. Ann. § 39–14–103(b)(vii) (emphasis added).[14] We found this statute unambiguous and were able to determine whether a particular cost is a "direct mining cost," by looking to the statutory list of such costs. *Powder River Coal*, ¶ 13, 145 P.3d at 447. However, as we have noted, Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) does not provide a list of "the direct costs of producing" nor any definitions for the components of the formula.

[¶ 33] Although we agree with the Department that the coal and bentonite statutory formulas express a clear legislative intent to exclude royalties and production taxes as direct costs, we do not view the comparative silence in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) as a clear statement of legislative intent. The three statutory formulas are not identical. All contain slightly different elements. One critical difference is that the oil and gas formula does not define its components. The specific exclusions of royalties and taxes in both the coal and bentonite statutes are set forth in expansive subsections defining the components of the formula. These explanatory, or definitional, subsections are absent from the oil and gas formula. Instead of recognizing the void in the language of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D), the Board found intent where none was expressed. The Board's conclusion that the legislature knew how to exclude items from various parts of the formula, but chose not to do so for oil and gas, goes too far. It is more accurate to say the legislature knew how to provide definitions for the various components of a proportionate profits statute, but chose not to do so for oil and gas. Rather than omit a specific exclusion from Wyo. Stat. Ann. § 39–14–203(b)(vi)(D), the legislature failed to provide any exclusions, definitions, or directions to identify the direct

---

14. The bentonite formula is found in Wyo. Stat. Ann. § 39–14–403(b)(iv)(A):

> For bentonite sold away from the mouth of the mine, the taxable value shall be calculated by adding to each producer's actual direct cost of mining per unit, an allocation of indirect costs, overhead and profit, per unit, as determined by the method prescribed in subdivision (I) of this subparagraph plus nonexempt royalty and production taxes per unit.

Additional guidance on cost allocation and the application of an industry wide factor is provided:

> (I) The allocation of indirect costs, overhead and profit, shall be determined initially and effective with the implementation of this section, by first calculating a bentonite industry wide percentage add-on factor, ... and second by multiplying this initial industry factor times each producer's actual average direct mining costs to mine-mouth per unit, excluding royalty and production taxes. This add-on amount shall be computed prospectively for each producer each year as prescribed in subdivision (III) of this subparagraph;
>
> ...

> (III) ... In no event shall the value of the bentonite product include any processing functions or operations regardless of where the processing is performed. As used in this subsection, direct mining costs include but are not limited to mining labor including mine foremen and supervisory personnel whose primary responsibility is extraction of bentonite, supplies used for mining, mining equipment, fuel, power and other utilities used for mining, maintenance of mining equipment, depreciation of mining equipment, reclamation, ad valorem property taxes on mining equipment, transportation of bentonite from the point of severance to the point of valuation and any other costs incurred prior to the point of valuation that are directly and specifically attributable to the mining operation. **Royalty and production taxes shall be excluded from mine mouth cost for purposes of computation.** In no event and under no circumstances shall the value of bentonite be less than the direct mining costs plus nonexempt royalty and production taxes;

Wyo. Stat. Ann. § 39–14–403(b)(iv)(A) (emphasis added).

cost of producing oil and gas. This distinction is important. If the oil and gas proportionate profits formula contained similar, or at least as extensive, definitional subsections, then we might find a comparison to the coal and bentonite formulas more helpful.

[¶ 34] Additionally, the Department contends that inclusion of royalties and production taxes in the direct cost ratio is compelled by our decision in *Hillard v. Big Horn Coal Company*, Wyo., 549 P.2d 293 (1976). The Board relied upon *Hillard* to find that, as a matter of law, royalties and production taxes are direct costs of producing a mineral. Accordingly, the Board determined that the "direct cost of producing" in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) unambiguously includes royalties and production taxes.

[¶ 35] In *Hillard*, we reviewed the Board's application of a formula it developed for the valuation of coal sold away from the mouth of the mine. The Board adopted the formula, by a minute entry. *Id.*, 549 P.2d at 296.[15] "The real effect of the minute entry, as applied, is to arrive at the value of the mineral at the mine by separating, as components of the total sales price, the value attributable to processing or transportation and the value of the mineral at the mine." *Id.*, 549 P.2d at 298. Application of the formula resulted in a

"value of the coal at the mouth of the mine . . . found to be the total of the direct mining costs plus the royalty plus the allocation of indirect costs and profit." *Id.*, 549 P.2d at 299.[16]

[¶ 36] *Hillard* involved a formula which allocated indirect costs, and we rejected the notion that royalties could be allocated between mining, processing, and transporting as indirect costs. Our holding that royalties were not indirect costs does not, however, lead to the conclusion that they are direct costs in a different formula. In fact, we differentiated royalties from other mining costs when we stated, "the value of the coal at the mouth of the mine must equal the costs of mining **plus royalty...**" *Id.*, 549 P.2d at 301 (emphasis supplied). Moreover, we emphasized the definition of royalty as an ownership interest, which distinguishes it from other costs incurred during mining.

[¶ 37] The coal companies in *Hillard* also argued that it was improper to include any of the production and severance taxes as mining costs. Taxes had been allocated as an indirect cost, and this Court did not second guess the decision to allocate them as indirect, rather than direct, costs. *Hillard* did not hold that taxes were a direct cost of mining.

15. The minute entry formula differed mathematically from the proportionate profits formula in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) and was not to be used for oil and gas. It provided:

*Minute Entry.* March 26, 1970.
The Board unanimously agreed that the value of minerals other than oil, gas and uranium should be determined by the following formula:
**Sales price of processed product f.o.b. contract or commercial carrier, minus all costs to point of determined sales price equals money profit. All costs to point of determined sales price less royalty divided into money profit equals percent of profit. Mining cost less royalty multiplied by percent of profit equals mine profit. Cost of mining plus royalty plus mine profit equals value of mineral as mined. If a sales price can only be obtained at a point after commercial transportation the price used will be that price less the commercial transportation charge.**
Uranium shall be valued by the Circular 5 price on the average yearly grade of each mine, reduced or increased by the percentage of the average yearly sale price of $U_3O_8$ per lb. The producer's transportation cost shall be de-

ducted on the basis of commercial transportation paid or actual cost plus a reasonable profit.
Oil, as in the past, will be valued at the contract or posted field price less transportation, if any, to the nearest pipeline tariff point.
*Hillard*, 549 P.2d at 296 (emphasis added).

16. The formula discussed in *Hillard* was not provided by statute, and mathematically speaking, it is distinguishable from the equation in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) because it involved not only the application of a ratio, but the deduction of costs as well. Use of these cost-deducting formulas was somewhat limited because, if costs were high, deductions could result in a negative or zero taxable value, as was noted in *Hillard. Id.*, 549 P.2d at 298. *See also Exxon Corp. v. Board of County Comm'rs*, 987 P.2d 158, 160 (Wyo.1999). In this regard, these formulas also resemble the netback formula. Wyo. Stat. Ann. § 39–14–203(b)(vi)(C). The potential to yield no taxable value under these formulas explains the prohibition on use of the netback formula for producer/processors like Taxpayers in this case. *Id.* It also causes us to question the wisdom of applying language in *Hillard* to an entirely different formula.

*Id.,* 549 P.2d at 302. However, it was recognized that taxes "are a part of the cost that necessarily must be covered by the value of the coal at the mouth of the mine, or otherwise the mining incentive might be lost." *Id.* "The value of the product at the mine must be enough to cover those expenses which must be paid to mine it and also the taxes imposed upon the product in addition to the royalty." *Id.*

[¶ 38] To summarize, *Hillard* provides a few salient principles applicable to this case. Royalties must be a full component of the taxable value of the mineral at the point of valuation, and no allocation to non-mining functions is appropriate. In addition to royalties, taxes are a necessary expense that the value of the produced mineral must cover. We disagree with the Board that the question of the proper components of the direct cost ratio in the proportionate profits formula was decided in *Hillard.* Rather, *Hillard* requires the full value of non-exempt royalties to be included in the taxable value of the mineral, and suggests that production taxes should be treated similarly.

[¶ 39] Contrary to the Department's assertions, Taxpayers' reading of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) does not violate these principles. The proportionate profits formula is consistent with *Hillard,* without including royalties and taxes in the direct cost ratio, because non-exempt royalties and taxes are not allocated between processing and other functions. Non-exempt royalties and production taxes are added in the last step of the formula. As a result of this last step, the resulting taxable value includes the full value of both non-exempt royalties and production taxes. We do not find *Hillard* determinative of the issue in this case.

[¶ 40] We must therefore resolve the ambiguity in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D). Taxpayers refer us to the Department's administrative interpretation of the statute as set forth in Rule § 4b. Administrative rules and regulations have the force and effect of law, and an administrative agency must follow its own rules and regulations or face reversal of its action. *Painter v. Abels,* 998 P.2d 931, 938 (Wyo.2000). Both parties acknowledge that the Department is bound by its rules that are consistent with the statute.

[¶ 41] Taxpayers contend that, as defined by Rule § 4b, the "direct costs of producing" do not include royalties and production taxes. They assert that the Board failed to properly consider and give effect to Rule § 4b in rendering its decision. We find merit in Taxpayers' position.

[¶ 42] Because the Board found that Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) unambiguously treats royalties and production taxes as direct costs of production, it gave minimal consideration to the Department's rule defining those costs. The Board reasoned that either Rule § 4b must be harmonized with its interpretation of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) or the rule must be disregarded because it was in conflict with the clear meaning of the statute. Our finding that the statute is ambiguous requires analysis of Rule § 4b. The Board is required to "[d]ecide all questions that may arise with reference to the construction of any statute affecting the assessment, levy and collection of taxes, **in accordance with the rules, regulations, orders and instructions prescribed by the department.**" Wyo. Stat. Ann. § 39–11–102.1(c)(iv) (LexisNexis 2005) (emphasis added). "The legislature has developed a framework in which valuation is the unique function of the Department. Not even the Board can challenge that function by changing definitions adopted by the Department." *Amoco Production Co.,* ¶ 22, 94 P.3d at 439. The Board failed to recognize the significance of Rule § 4b.

[¶ 43] We interpret rules in the same manner as statutes, looking first to the plain language. Rule § 4b provides an extensive list of items which are to be considered "direct costs of producing." Royalties and production taxes are not mentioned. Prior to *Amoco 96–216,* the Department's application of the rule was consistent with this omission because it did not consider these items to be direct costs of producing in the proportionate profits formula. Currently, the Department asserts a different reading of Rule § 4b. It maintains that royalties and taxes may be included under the catch-all language as

"other direct costs incurred prior to the point of valuation that are specifically attributable to producing mineral products." DOR Rules, Chap. 6, § 4b(w).

**[¶ 44]** We will defer to an administrative agency's construction of its rules unless that construction is clearly erroneous or inconsistent with the plain meaning of the rules. *Pinther v. Department of Admin. & Info.*, 866 P.2d 1300, 1302 (Wyo.1994). The Department has applied different interpretations of Rule § 4b over time, initially taking an approach consistent with Taxpayers' position in this appeal.[17] We are inclined to attribute more weight to this earlier interpretation.[18] "[A]dministrative interpretation developed during, or shortly before, the litigation in question is entitled to less weight than that of a long-standing administrative interpretation of administrative rules." Norman J. Singer, 1A *Statutes and Statutory Construction* § 31:6, p. 730 (6th ed.2002). More importantly, we must reject the Department's current interpretation of Rule § 4b because it is contrary to the rule's plain language.

**[¶ 45]** Again, Rule § 4b provides:

17. Taxpayers assert that the Department's change of position required it to promulgate a new rule. We are sympathetic to this claim, having stated: "[I]t is unfair and unlawful for an administrative agency to establish a policy requiring taxation at a late hour contrary to plainly stated language already relied upon by taxpayers without first giving adequate notice and warning and clarifying its position for the benefit of taxpayers." *UPRC*, ¶ 17, 67 P.3d at 1184. Formal rule adoption also seems indicated by Wyo. Stat. Ann. § 39–11–102(d)(i) (LexisNexis 2005). However, our resolution of this case makes it unnecessary to address this argument.

18. We also reject the notion that the Department was simply mistaken during the first decade it administered Wyo. Stat. Ann. § 39–14–203(b)(vi)(D). The Department's first interpretation of its rule carries more weight, as expressed by a Florida court:

Here the Department admittedly used one formula for the years 1974, 1975 and 1976, which did not include the severance tax as an element of "value"; then in 1977 the Department changed its formula by treating the severance tax as a cost to the taxpayer which it added to "value" of the minerals at the point of severance, even though there had been, in the meantime, no change in the statutory definition of "value," no change in administrative

"Direct costs of producing" includes labor for field and production personnel whose primary responsibility is extraction of crude oil, lease condensate, natural gas and other mineral products removed from the production stream before processing; materials and supplies used for and during the production process; depreciation expense for field equipment used to take the production stream from the wellhead to the point of valuation; fuel, power and other utilities used for production and maintenance; gathering and transportation expenses from the wellhead to the point of valuation; ad valorem taxes on production and transportation equipment; intangible drilling costs, including dry hole expense; **and other direct costs incurred prior to the point of valuation that are specifically attributable to producing mineral products.**

(Emphasis added.)

**[¶ 46]** To determine whether royalties and production taxes can be considered "other direct costs" contemplated by Rule § 4b, we apply the doctrine of *ejusdem generis*. "Such general words, following an enumer-

regulations pertaining to the severance tax, and no change in the industry which would justify a change in the computation of the taxable value of the phosphate. Furthermore, although amendments to the law were made in 1975 and 1977, the legislature did not redirect the Department as to the manner of determining the value upon which the tax should be assessed. A rule of statutory construction frequently applied is that the interpretation by an agency charged with administering a statute is to be given substantial weight. This rule has an even greater application when the agency attempts to change its administrative interpretation of the statute without any known or readily discernable reason for doing so. In this instance, we give greater weight to the first administrative interpretation, and reject its later unsolicited revision. *See Hillsborough County Environmental Protection Commission v. Frandorson Properties*, 283 So.2d 65, 68 (Fla. 2nd DCA 1973); *Heftler Construction Company v. Department of Revenue*, 334 So.2d 129 (Fla. 3rd DCA 1976). Accordingly, we affirm the decision of the trial judge awarding a refund of 1977 taxes, and requiring computation without reference to the Department's amended formula. *Miller v. Agrico Chemical Co.*, 383 So.2d 1137, 1139 (Fla.Dist.Ct.App.1980).

ation of words with specific meanings, should be construed to apply to the same general kind or class as those specifically listed." *Powder River Coal,* ¶ 19, 38 P.3d at 429. Applying this principle to Rule § 4b, one easily concludes that the detailed list of costs are not. in the same class or of the same nature as royalties or production taxes. The rule identifies certain expenses for labor, materials, and supplies, depreciation for field equipment, and fuel, power, and other utilities that should be considered direct costs of producing. Additionally, the rule specifies "ad valorem taxes on production and transportation equipment." It does not make sense that this specific type of tax would be listed, while the more general, and presumably greater, tax obligation would be relegated to. the catch-all provision. Similarly, royalties are a predictable and significant item likely involved in every production scenario. Given the significance of royalties and production taxes in oil and gas production, we would expect those items to be enumerated as direct costs of producing. The omission of royalties and production taxes from Rule § 4b must have been deliberate.

[¶ 47] We find the language of Rule § 4b clear and unambiguous. Royalties and production taxes are not "direct costs of producing." Excluding these items from the direct cost ratio does not conflict with Wyo. Stat. Ann. § 39–14–203(b)(vi)(D), and we find it appropriate to resolve the ambiguity in the statute in accordance with the plain language of the Department's rule interpreting it. Accordingly, we hold that royalties and production taxes should not be included as direct costs of producing in the direct cost ratio of the oil and gas proportionate profits formula.

[¶ 48] Moreover, resolving the ambiguity in Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) in a manner favorable to Taxpayers is appropriate. The formula directly impacts the amount of tax, and should be construed as an imposition statute. Statutes levying taxes should not be extended, by implication, beyond the clear import of the language used, or their operations enlarged

to embrace matters not specifically addressed. *Amoco Production Co.,* ¶ 18, 94 P.3d at 438. Article 15, Section 13 of the Wyoming Constitution requires that "every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." We believe the legislature is well acquainted with the need to draw its tax statutes carefully and with precision. The legislature specified how royalties and production taxes were to be treated in the first and final steps of the formula. If the legislature had intended royalties and production taxes to be included in every step of the formula, we would expect to see that intent reflected in the language of the statute.

[¶ 49] The Department makes several other arguments regarding legislative intent which do not persuade us. The Board used legislative inaction to confirm its decision in *Amoco 96–216* and its interpretation of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D). A bill introduced during the 2002 legislative session, "Senate File 69," proposed amendment to Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) to specify that non-exempt royalties and production taxes would be excluded from the direct cost ratio. S. 69, 56th Leg. (Wyo. 2002). The Department adopts the Board's reasoning and argues that the bill's failure should be viewed as "presumptive evidence of the correctness of [its] interpretation reflected in *Amoco 96–216.*"

[¶ 50] We do not find Senate File 69 that helpful. We have described legislative inaction as "a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute." *Brown v. Arp & Hammond Hardware Co.,* 2006 WY 107, ¶ 35, 141 P.3d 673, 684 (Wyo.2006), quoting Norman J. Singer, 2B *Statutes and Statutory Construction* § 49:10, p. 112–115 (6th ed.2000). As Taxpayers correctly point out, the proposed legislation addressed topics beyond and apart from the components of the direct cost ratio. It would be speculative to assume that the bill failed because *Amoco 96–216* was correct.[19] We are hard pressed to find a clear

---

19. The digest of action taken on Senate File 69 does not reflect either clear approval or disapproval of the Board's conclusion in *Amoco 96–*

216. Digest Senate and House Journals, 56th Leg., Senate File 0069, at 180–182 (2002). Additionally, the decision in *Amoco 96–216* was not

statement of legislative intent in the consideration of Senate File 69, and the Board's reliance upon it was misplaced.

[¶ 51] In its final argument, the Department expresses concern that Taxpayers' reading of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) yields absurd results. The Department claims that the results of excluding royalties and production taxes from the direct cost ratio in calculating proportionate profits do not equate to fair market value. By contrast, Taxpayers contend, somewhat persuasively, that the Department's approach undermines the allocation function of the direct cost ratio because as prices for oil and gas rise, royalties and production taxes also increase. As a result, the direct cost ratio approaches 100% when prices are high, negating the purpose of allocating a portion of a taxpayer's revenue to non-taxable functions, i.e. processing and transporting. Regardless, we have cautioned the Board to avoid making decisions based upon the tax revenue to be generated for the State. *Amoco Production Co.,* 12 P.3d at 674 ("The statutory mandate to the Board is not to maximize revenue or to punish nettlesome taxpayers, but to assure the equality of taxation and fairly adjudicate disputes brought before it.").

[¶ 52] To the extent the Department argues that our interpretation of Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) results in low tax values, we believe that is a matter more appropriately presented to the legislature. Taxation is a legislative power. *Rocky Mountain Oil and Gas Ass'n,* 749 P.2d at 240. By enacting Wyo. Stat. Ann. § 39–14–203(b), the legislature has declared what fair market value of oil and gas production shall be. Proper application of the statutory formula leads to a value which, as a matter of law, is fair market value.[20] Our role is to give effect to the legislature's choices expressed in the statute. Practically speaking, we would point out that if the Department does not like the results under proportionate

profits, it may select another method to apply in the next three year period.

***Other issues***

[¶ 53] Prior to our decision in *Amoco Production Co.,* ¶ 20, 94 P.3d at 439, the Board permitted Fremont County to intervene in Burlington's cases leading to this appeal. Our holding in *Amoco* was clear: "A county cannot challenge a decision by the Department regarding valuation methodology or any substantive decision regarding the application of a chosen valuation methodology, including the definition of inputs into valuation equations." *Id.,* ¶ 20, 94 P.3d at 439. Apparently recognizing that holding as controlling, the county did not participate in this appeal and appears to have abandoned its status as intervenor. Therefore, we need not address Burlington's challenge in that regard. Moreover, given our resolution of this case, it is not necessary to resolve Chevron's constitutional challenge or its objection to the assessment of interest.

## CONCLUSION

[¶ 54] The Board erroneously found that Wyo. Stat. Ann. § 39–14–203(b)(vi)(D) unambiguously requires royalties and production taxes to be included in the direct cost ratio. This conclusion led the Board to disregard the Department's Rule § 4b, which was at odds with its statutory interpretation. The language of that rule is clear and does not include royalties and production taxes as direct costs of producing. The Department's promulgated definition is not inconsistent with the statute and must be given effect. We find that excluding royalties and production taxes from the direct cost ratio provides a more reasonable interpretation of the statute while giving effect to the Department's rule. The decisions of the Board are reversed.

---

final because an appeal was pending before this Court.

**20.** We note that, unlike application of a cost deducting formula like that used in *Hillard* or the netback method, the proportionate profits formu-

la will always yield some taxable value. Because of the addition of royalties and production taxes in the last step, the result cannot be zero. The proportionate profits method may guarantee tax revenue for the State when prices are depressed. *See* n.16.